# Dorris v. Morrisdale Coal Company, Appellant.

*Equity—Contract—Reformation of written instrument—Evidence—Mining lease.*

When an attempt is made to reform a contract in a common-law action the trial judge performs the functions of a chancellor, and if as a chancellor he would not reform a contract under the testimony offered, as a judge he should not permit a jury to do what he would not sanction in a proceeding in equity.

Where two mining leases, for different but adjoining tracts of land, are executed at different times between the same parties, a condition of the strata in one tract, which under the terms of the lease would relieve the lessee from the payment of minimum royalties for that tract, cannot be set up as a defense against the payment of the minimum royalties for the other tract, in the absence of clear, precise and indubitable evidence that such was the intention of the parties when the second lease was executed.

Where a lessor of coal executes to the same lessee a second lease for an adjoining tract, and both leases provide for a minimum royalty, unless a serious fault in the mine shall restrict operations, and the second lease refers to the sinking of a second shaft without designating where it shall be sunk, and the lessee sinks the shaft on the land covered by the first lease, encountering serious faults in the coal, he cannot relieve himself from the payment of the minimum royalty under the second lease, as to which the coal had not been touched.

*Evidence—Writings—Diary—Practice, C. P.*

The personal diary of a deceased plaintiff brought into court by subpoena at the instance of the defendant, will not be admitted in evidence where there is no averment that there is anything in the diary pertinent to the issue; nor can the trial judge be called upon to examine the diary to determine if there is anything pertinent to the issue, when no facts nor any circumstances are shown by affidavit or otherwise to warrant the presumption that it contains pertinent facts.

Argued April 17, 1906.   Appeal, No. 66, Jan. T., 1906, by defendant, from judgment of C. P. Clearfield Co., May T., 1904, No. 290, on verdict for plaintiff in case of Annie Dorris, Julia Dorris et al., Executors of William Dorris, v. Morrisdale Coal Company.   Before FELL, BROWN, POTTER, ELKIN and STEWART, JJ.   Affirmed.

Assumpsit to recover royalties on a mining lease.   Before REED, P. J., specially presiding.

At the trial it appeared that William Dorris in his lifetime owned the undivided four-tenths interest in about 2,666 acres

of land in Clearfield county.   On March 1, 1893, he leased his interest in the "B" seam of coal under 1,000 acres of that land to his cotenants.   The interest of the lessees (his cotenants) under this lease in 1895 became vested in the Morrisdale Coal Company.   On September 1, 1898, William Dorris leased his interest in the "B" seam of coal under the remaining 1,666 acres to the Morrisdale Coal Company.   Each of these leases contained a provision for the payment of a minimum royalty of $3,200 per year, that is to say, the Morrisdale Coal Company agreed to mine under each lease 100,000 tons of coal annually, "unless a serious fault in the mine or other unusual or unforeseen occurrence or inability to obtain sufficient transportation, or the quality of the coal on the demised premises be of such a character as to justify a prudent operator in restricting the operation of the mine."

The lease of September 1, 1898, contained a stipulation as to the sinking of a second shaft.   No second shaft was sunk in the land covered by the second lease, and no coal was mined from this land.   There was evidence that a second shaft was sunk, or an old one cleared out, on the 1,000-acre tract.   The defendants attempted to excuse a nonpayment of royalties under the second lease by reason of serious faults in the strata of the coal covered by the first lease, and attempted to show that it was the intention of the parties that if there was a fault in the coal in the first tract it would relieve the lessee from payment of royalties under the second lease.

The court refused to admit in evidence the diary of William Dorris, deceased.  [22]

The court charged in part as follows:

[If the location of shaft No. 2, as made, was agreed upon between the parties, and if this is to be treated or considered as a part of the agreement of lease dated September 1, 1898, then that lease is rendered somewhat ambiguous and difficult of interpretation.   The defendant recognizes this, and alleges that the lease as written does not fully and clearly express the purpose and intent of the parties executing it, and has offered testimony to amend or reform it; but the testimony introduced for this purpose does not fully meet all the legal requirements necessary to amend or reform a written contract, and therefore

I am constrained to say to you that the written lease of September 1, 1898, signed by the parties, contains the entire contract made between them, and is the only evidence of what that contract is, and its interpretation is for the court, unless the parties themselves have put upon it an interpretation upon which they acted.] [17]

[If the defendant has established by evidence that is clear, precise and indubitable that as to the second lease the real contract between the parties is not fully and precisely expressed in the preliminary agreement of April 25, 1898, and the lease of September 1, 1898, as to the extent of the demised premises, in that the same extended to the entire property jointly owned by the parties, to wit: the two tracts containing 2,666 acres, and was not confined to the upper tract containing 1,666 acres as stated therein, and that the stipulation that it thus extended to the property as a whole was omitted from the said contracts by the accident or mistake of both parties, said contracts should be reformed, and if the jury so find from the evidence, then the rights of the parties are to be judged of from the contracts as they thus really existed between them.

As already stated, I do not think the evidence is sufficient to amend or reform the written contract, and therefore this point is refused. The jury will recall what has been said in our general charge on the question of what interpretation the parties themselves placed upon said contract and how that affects it and the operations under it.] [19]

[But if the shaft was located without his (Dorris') knowledge or consent at the point where it is located, and is not properly located to develop and take out the coal from under the 1,666 acres and is practically useless for that purpose, then the plaintiffs cannot be required to contribute the $8,000 or any other sum to its construction, and consequently no reduction on that account should be made from royalties accruing to the plaintiff under the lease of September 1, 1898.] [20]

[What I have said about the production of coal in shaft No. 1 and the prosecution of the work at that shaft applies in every particular to shaft No. 2, providing you find under the evidence under the instructions already given that the parties agreed to this location and also interpreted the lease of Sep-

tember 1, 1898, as authorizing it at its present site, and the defendant in that event would be liable for minimum royalties from September 1, 1898, to September 1, 1903, or be relieved from their payment on the same conditions that it would be liable for or relieved from their payment at shaft No. 1 ; and it is unnecessary for me to repeat what has just been said to you about the defendant's liability for minimum royalties at shaft No. 1 and what would relieve it from the payment of such royalties. The only difference between the two leases in this respect is the dates.] [21]

[If you find from the testimony that it was to be located on the leased premises as contended for by the plaintiffs, it appearing that no such location has been made, and it further appearing that no mining has been done by the defendant on the 1,666 acres, or that there was anything to prevent the mining of the coal, it would follow from the terms of the lease that the plaintiffs are entitled to recover the minimum royalty of $3,200 per year under that lease from September 1, 1898, to September 1, 1903, against which the defendant would be entitled to a credit for the payment of the Girard Trust Company mortgage of $6,000 and interest at five per cent as provided for in the lease, but would not be entitled to any credit for the $8,000 which the lessor agreed to contribute to the construction of shaft No. 2, since it was not located in accordance with the agreement of the parties.] [23]

Verdict and judgment for plaintiff for $21,308.52.

On motion for a new trial REED, P. J., filed the following opinion:

The defendant's contention that shaft No. 2, in connection with the lease of September 1, 1898, was to be located at the southwest corner of the tract covered by the lease of March 1, 1893, made it practically impossible to give effect to the most important feature of the first-mentioned lease so far as the lessor was concerned. The undisputed testimony showed that in the absence of faults and other difficulties that might be encountered in mining the coal, if there had been nothing but clean coal of workable height to drive through, the coal in the demised premises described in the lease of September 1, 1898, could not have been reached from shaft No. 2, located as con-

tended for by the defendant, short of three years, and with the difficulties of mining the coal which actually existed, and which were manifestly known to the defendant at the time of executing the lease, it could not be reached in ten years. Yet the lease provides for the payment of a minimum royalty of $3,200 per year on coal to be mined from the demised premises through shaft No. 2. Recognizing that its location of shaft No. 2 postponed indefinitely the payment of royalty to the lessor, contrary to the express provisions of the lease, it was contended that the lease of September 1, 1898, was intended to be an enlargement of the lease of March 1, 1893, so as to make it cover the entire tract of 2,666 acres, with two openings, from each of which a minimum royalty of $3,200 per year was to be paid, unless the mining of 100,000 tons of coal annually from each shaft was prevented by some serious fault, etc. In support of this contention an attempt was made to reform the written lease so as to effectuate what the defendant alleged was the intent of the parties in executing it. If we have a proper conception of the law with reference to altering, modifying or reforming a written instrument, this attempt on the part of the defendant failed utterly. If the testimony offered for this purpose demonstrated anything, it clearly demonstrated that there was neither fraud, accident nor mistake in the execution of the written lease, and furthermore, that the lease as written embodied precisely the contract as agreed upon between the parties. It may be that they entertained different views as to the interpretation that might be placed upon it, or of which it was susceptible. If they did, these views were not expressed, or made a part of the contract at the time of its execution by them. Hence, if any error was committed in submitting the case to the jury on the question of whether the lease was to be interpreted as written, it was committed in favor of the defendant. While counsel for the defendant, in reply to their inquiry, were told that the question of reforming the written lease would be withdrawn from the consideration of the jury, they were at the same time informed that the question of whether or not shaft No. 2, as located, was an agreed location would be submitted to the jury, and that question was fully argued by them, and, we think, fairly presented in the charge of the court to the jury for their determination. The court

construed the lease with reference to such location, and thus the defendant had the benefit of all that it contended for, and if there was any error in this it is one the defendant cannot complain about. The complaint that the court failed to call the attention of the jury to the distance and intervening difficulties between the shaft so located and the 1,666-acre tract, to mining the coal from said tract, is not well founded. If the lease of September 1, 1898, was an enlargement of the lease of March 1, 1893, as contended for by the defendant, then the defendant was liable for the payment of the minimum royalty from shaft No. 2 if the coal could be mined anywhere on the entire tract of 2,666 acres. This shows the vice in defendant's second point and explains why that point was refused. The jury was fully instructed as to what would relieve from payment of the minimum royalty on coal to be taken out through shaft No. 2, and the distance of its location from the 1,666-acre tract was not an element to be considered. Neither can we assent to the contention that the lease of September 1, 1898, provides for the location of shaft No. 2 on the demised premises which are stated to be the 1,666-acre tract, and that recognizing the right to locate it as actually located is reforming the written lease. Excluding all extraneous evidence, and having recourse to the writing alone, that is the interpretation the court would be disposed to put upon it. But it is to be observed that the lease does not in terms provide whether shaft No. 2 shall be sunk on or off the demised premises, and this leaves room for a construction of the lease by the parties that would permit of the location contended for by the defendant. In any event, it is immaterial whether the lease could be reformed by an interpretation of it by the parties, on which they acted, since the defendant had the benefit of such instruction to the jury, and it being entirely clear that the evidence was otherwise insufficient to reform it. In other words, if the court was right in withholding from the consideration of the jury the question of the reformation of the written lease because of a lack of evidence to warrant its submission to them, the defendant ought not to complain because it was given an opportunity through another channel to reach the same port.

We are not convinced that there is error in our answer to the defendant's fifth point for charge. The point was affirmed,

omitting the words " and the coal mined without loss." To
have affirmed it with those words included would have been
to insert in the contract of the parties causes for relieving
against mining the coal not specified in the contract. The
condition of the market might make the mining of the coal un-
profitable, and other conditions not specified in the lease might
arise which would prevent the coal being mined except at a
loss to the defendant. If it was intended to say that the coal
could not be mined without loss because of the obstacles des-
ignated in the lease, the words " and the coal mined without
loss " should have been so limited. The point was complete
without these words, and the defendant was not harmed by its
affirmation with the said words omitted. The defendant's
eleventh point substitutes reasons other than those provided
for in the lease for relieving against its failure to mine the
minimum quantity of coal annually. The facts suggested in
this point do not constitute an estoppel, nor are they sufficient
in law to discharge a breach of the defendant's contract in not
taking out the stipulated quantity of coal each year. Neither
do they justify the conclusion that Mr. Dorris was satisfied
with the work of the defendant in carrying out the contract,
or warrant the presumption that the defendant did its entire
duty in respect to the amount of coal mined. For these rea-
sons the point was refused, and our examination of the au-
thorities cited on the argument of this motion has failed to
convince us that there was error in its refusal. Neither can
we assent to the contention that the burden was on the plain-
tiffs to show that the minimum quantity of coal could be mined
annually. The authorities cited in support of this contention
are made to turn on the stipulations of the litigated contract,
and are readily distinguishable from the case in hand. The
defendant, in the lease under consideration, bound itself to take
out of the demised premises at least 100,000 tons of coal an-
nually, or pay royalty on that quantity whether taken out or
not, " unless a serious fault in the mine, or other unusual or
unforeseen occurrence, or inability to obtain sufficient trans-
portation, or the quality of the coal on demised premises be of
such character as should justify a prudent operator in restrict-
ing the operation of the mine. No hindrance involving a stop-
page of mining for less than thirty days to be considered as a

factor in relieving the said party of the second part from the full performance of this covenant." It is not alleged that there was not sufficient merchantable coal in the demised premises to meet the requirements of this covenant. Nor does the case involve any question of mining the coal advantageously or at a profit to the lessee. The covenant to take out at least 100,000 tons each year could only be discharged by showing a serious fault in the mine, etc., that prevented the lessee from taking out the stipulated quantity. Moreover, the relieving causes involve matters largely, if not exclusively, within the knowledge of the lessee, and therefore when interposed as a defense the burden was on it to prove the same.

In the reasons assigned for a new trial it is alleged that the court erred in the admission and rejection of evidence. The only error in this respect commented upon by counsel was the refusal of the court to compel the production of the diary kept by William Dorris, deceased. It appeared that Miss Dorris, the executrix, had possession of this diary, and had it with her in court at the time defendant called for its production. If it be conceded that a diary is such book or writing the production of which will be compelled by the court, there were no grounds laid for its production in this case. There was nothing before the court to show that the diary in question contained anything pertinent and material to the defense. We are not aware of any statute, or rule of the common law, that authorizes a court to require the production of books and writings in the possession of the adverse party without proof that they contain evidence pertinent to the issue. If notice to produce a certain book or writing is not complied with, the remedy by the common law is to admit secondary evidence of its contents. This implies that the court is without authority to compel its production; it also implies that the book or writing, the production of which is asked for, contains evidence material and relevant to the case. If production is claimed under the act of February 27, 1798, 3 Sm. L. 303, proof must be made that the book or writing contains evidence pertinent to the issue. The defendant failed to bring itself within any recognized legal rule authorizing the court to require the production of the diary called for, and furthermore, the application was properly refused on the ground that it was manifestly for the purpose of a fish-

ing examination of the decedent's diary to see if any evidence could be found in it to contradict his testimony in the case that he had no knowledge of the location of shaft No. 2, which fact was controverted by the defendant.

Regarding the contention that the present location of shaft No. 2 was the location agreed upon between the parties, it must be conceded that there is considerable testimony to sustain it. But it is opposed by testimony equally strong and persuasive that it is not the place of the location of the shaft contemplated by Mr. Dorris for taking out the coal from the demised premises covered by the lease of September 1, 1898. If the rights of the lessor under that lease are to receive any consideration whatsoever, then the lease must receive a construction either by itself or in connection with some other lease that will secure to the lessor the payment of the annual rental for which it provides. Considered by itself the location of shaft No. 2 at its present site would virtually nullify this provision in the lease, and before any rational mind would be willing to accept that location as being within the contemplation of the parties executing the lease, the testimony would have to be overwhelming to that effect. The defendant is laboring under a serious error in assuming that there is no testimony save that of Mr. Dorris himself opposed to its contention that shaft No. 2 is located at the place agreed upon between them. The lease of September 1, 1898, in all its essential provisions, is so antagonistic to such location that the plaintiffs might stand on it alone as an answer to all of the defendant's testimony to the contrary. But it is alleged by the defendant that the lease of September 1, 1898, was intended to be an enlargement of the lease of March 1, 1893, and that the two leases are to be construed together as constituting one lease covering the entire tract of 2,666 acres. But even here the defendant is inconsistent, because it contends that taking the two leases together, it is not liable for the minimum royalty from shaft No. 2, as located by it, until the coal can be reached through it and mined from the premises described by the lease of September 1, 1898. (See defendant's second point for charge.) And this position was insisted upon in the argument of this motion for a new trial. As already stated, it is scarcely conceivable that the parties in executing the lease of September 1, 1898, intended to make shaft No. 2, as located,

the opening for taking out the coal from the demised premises, and if they intended that lease merely as an enlargement of the lease of March 1, 1893, it is likewise inconceivable that intelligent business men and eminent lawyers, after mature deliberation in reaching the terms of the contract and careful examination to see that the lease contained them and clearly expressed the intent of the parties to it, should have made such a bungling job of it. However this may be, the defendant had a full and fair opportunity of proving before the jury its contention that shaft No. 2 was sunk at the place agreed upon, and we think the facts and circumstances in evidence to the contrary warranted the finding of the jury against such location. The defendant's third reason for a new trial is that the jury did not consider this question, but this assignment was abandoned and need not be further considered.

The jury, under instructions from the court, returned an itemized verdict, and this enables us to correct an error which we believe was committed in submitting to the jury the question of an additional royalty claimed by the plaintiffs on the coal mined from the "D" or Moshannon seam of coal. In our judgment the evidence did not warrant the submission of that question to the jury, and the defendant's sixth point should have been affirmed. Mr. Dorris, beyond question, knowingly accepted royalty at the rate of three and one-fifth cents per ton to him on all the coal mined from this seam, and with full knowledge of the quantity being mined assented to this rate, and he thereby estopped himself from claiming a higher rate than that for which he settled. This item of the plaintiff's claim as shown by the verdict amounts to $2,757.76, and by striking it out of the verdict we shall accomplish what should have been accomplished by an instruction to the jury to reject or disregard this item of the plaintiffs' claim in reaching their verdict. This reduces the verdict $21,308.52, for which amount, when paid, the defendant is entitled to reimbursement out of the royalties accruing on coal mined from the demised premises in excess of the stipulated minimum quantities to be mined each year.

And now, February 2, 1906, the rule heretofore granted is discharged and the motion for a new trial refused, and thereupon it is ordered, in accordance with the foregoing opinion,

that judgment be entered on the verdict for the plaintiffs and against the defendant for the sum of $21,308.52, with interest from September 23, 1905, and costs of suit upon payment of the jury fee.

*Errors assigned* were (17, 19, 20, 21, 23) above instructions, quoting them ; (22) ruling on evidence, quoting the bill of exceptions.

*Leoni Melick,* of *Melick, Potter & Dechert,* and *John G. Johnson,* with them *Gordon & Boulton,* for appellant.—It was the duty of the court to have required the production of the books, to have examined them, and, if found to contain entries relevant to the issue, admitted them in evidence on motion of the defendant: Boynton v. Boynton, 16 Abb. Pr. 87; Powers v. Russell, 26 Mich. 179; Union Paper Collar Co. v. Metropolitan Collar Co., 3 Daly (N. Y.), 171; Ahlmeyer v. Healy, 14 Daly, 288; Lefferts v. Brampton, 24 How. Pr. 257.

*David L. Krebs* and *Thomas H. Murray,* with them *A. M. Liveright, Jas. P. O'Laughlin* and *Hazard Alex. Murray,* for appellees.

Opinion by Mr. Justice Elkin, June 27, 1906 :

In the view we take of this case it will not be necessary to consider in detail the many questions raised by the numerous assignments of error.   We cannot accept as sound the contention of learned counsel for appellant that there was such clear, precise and indubitable evidence produced at the trial as to warrant a submission of the question of the reformation of the contract to the jury on the ground of fraud, accident or mistake.   The presumption always is that a written instrument expresses the true intent of the parties who executed it, and when an attempt is made to vary the terms, set aside, or reform a contract solemnly entered into a heavy burden rests upon the party seeking the reformation.   When an attempt is made to reform a contract in a common-law action the trial judge performs the functions of a chancellor, and if as a chancellor he would not reform a contract under the testimony offered, as a judge he should not permit a jury

to do what he would not sanction in a proceeding in equity. These general rules are supported by ample authority: 24 Am. & Eng. Ency. of Law (2d ed.), 650; Stine v. Sherk, 1 W. & S. 195; Rowand v. Finney, 96 Pa. 192; Phillips v. Meily, 106 Pa. 536; Boyertown National Bank v. Hartman, 147 Pa. 558. In the case at bar the facts relied on by appellant are not sufficient to justify a chancellor in decreeing a reformation of the contract, and it necessarily follows that the learned court below committed no error in refusing to submit this question to the jury.

The lease of September 1, 1898, was executed between intelligent parties after several months of negotiations during which time all matters pertaining thereto were carefully considered. The conclusion is irresistible that the lease as executed is not only an expression of the intention of the parties, but is the definitely understood agreement entered into between them. If the lessor in the second lease had been an outside party, not interested in the first lease, it could not be successfully contended, in the absence of an express covenant to that effect, that a fault in the mine, or an unusual or unforeseen occurrence, or the quality of the coal in an adjoining property could be set up to defeat a claim for the minimum royalty to be paid under the terms of the lease of the demised premises. Under the covenants of the second lease the lessee was bound to mine and take away from the 1,666-acre tract sufficient coal to produce a minimum royalty to the lessor of $3,200 per annum. This was a definite, absolute undertaking and could only be excused upon the conditions set out in the lease itself. Faults in the mine and other conditions relied on to excuse the payment of royalties in the second lease relate to the strata and the mining of coal underlying the therein described premises and have no reference to conditions which may have been found to exist on the adjoining property demised under the first lease. In these respects each lease must stand upon its own terms, the second is not dependent upon the first, nor is the first modified by the second. It is perfectly clear that it was the intention of the parties to the second lease to increase the output of coal on the one hand and to insure a larger amount of royalty on the other. The lessor desired to make his undeveloped lands productive; the lessee wanted to secure a larger

tonnage of coal. The first lease executed in 1893 provided for the payment of royalty on at least 100,000 tons annually. It covered an area of 1,000 acres of land. The lessee acting with business prudence and foresight desired to control the output of the whole tract. With this end in view negotiations were opened between the parties which resulted in the execution of the second lease. It would do violence to the intelligence and integrity of the parties concerned to hold that after the second lease had been deliberately made and solemnly entered into the lessor would have no greater returns in royalty than he already enjoyed under the terms of the first lease, and yet this would be the practical result if the contention of appellant should prevail. One party to the contract was an eminent lawyer acting for himself and in his own interest, the other parties were reputable, prudent and capable business men. They were familiar with the property and understood the nature and character of the business about which they were contracting. They made their own covenants and are bound by them, one of which provides for the payment of a minimum royalty each year. A careful consideration of the able and exhaustive argument of learned counsel for appellant has failed to convince us that any facts were established at the trial that would excuse the payment of the minimum royalty provided to be paid in the second lease.

It may be conceded that there was some misunderstanding between the parties as to the location of shaft No. 2. In our opinion, the location of this shaft has nothing to do with the amount of coal to be mined or the minimum royalty to be paid under the covenants of said lease. Without regard to the location of this shaft, whether on the 1,666-acre tract or on the 1,000-acre tract, the minimum royalty must be paid according to the terms of the lease. If shaft No. 2 had been located within the boundaries of the 1,666-acre tract, the lessee would then be in position to set up faults in the mine, quality of the coal and other conditions relied on to excuse the payment of royalties, but inasmuch as the coal under this tract has not been touched, these questions cannot now be raised to defeat the claim for royalty due under the terms of the second lease. On the other hand, since the lessee thought proper to sink shaft No. 2 on the 1,000-acre tract and deemed this the better

way of developing the property, conditions relating to that tract cannot be set up to defeat the claim for royalty due under the later lease.   In these respects each lease is dependent upon and governed by conditions relating to the coal or the mining of the same within the boundaries described in the respective leases.   The recent case of Troxell v. Anderson Coal Mining Company, 213 Pa. 475, applies with convincing force to the facts of the case at bar when as hereinbefore stated the first and second leases are treated as separate independent contracts.

The question as to the contribution of $8,000 to be made by the lessor toward the sinking of shaft No. 2 was properly submitted to the jury.   It was a disputed question of fact and we do not see that any reversible error was committed by the learned trial judge in its submission.   The twenty-second assignment seeks to convict the trial judge of error in refusing to compel the production of the private diaries of William Dorris, deceased, in the possession of an executrix, who was served with a duces tecum subpœna to produce them at the trial. We do not doubt that a diary may become an evidentiary writing, the production of which will be compelled in the trial of a cause under some circumstances and for proper purposes. It should be observed, however, that a diary is in the highest sense a personal and private record, not usually intended for public inspection, and when it is sought to invade this privacy by compelling the production of such a writing in evidence it is the duty of the trial judge to see that it is not done for the purpose of enabling one party to make undue inquisition into the private affairs of another; and the party making the offer must satisfy the court that it contains facts material or relevant to the issue.   It has been held that an inspection of books and papers will be granted if facts and circumstances are shown which will warrant a presumption that the book or document sought contains evidence of the fact which the party applying has to establish: Lefferts v. Brampton, 24 How. Pr. 257.   We do not question this rule, but it does not aid appellant in the case at bar, because no facts or circumstances were shown to warrant the presumption that the diary of William Dorris, deceased, contained any evidence of the facts sought to be established.   Nor do we think it was the duty of the court, as

contended by appellant, to require the production of the diaries, to have examined them, and, if found to contain entries relevant to the issue, to then admit them in evidence. This would have been a judicial fishing excursion which the court was not required to indulge, as a mere matter of discovery for the benefit of the party applying, without such party having first shown that the diaries contained facts pertinent to the issue involved.

In this connection it must not be overlooked that there was no definite allegation that the diaries contained evidence of the facts sought to be established, or that appellant had any knowledge of the contents of the diaries, nor were any facts or circumstances shown to the court by affidavit or otherwise that the diaries contained facts pertinent to the issue ; and hence the cases cited from other jurisdictions and relied on by appellant are not applicable to the facts of the present case. The learned court below in his opinion refusing a new trial clearly shows that appellant company did not bring itself within any rule which would require the production of the diaries. For these reasons no reversible error was committed in refusing to compel their production.

Assignments of error overruled and judgment affirmed.