[No. 16449.  Department Two.  October 21, 1921.]

# Angus J. Oliver et al., Respondents, v. Alex Polson et al., Appellants.[1]

MINES AND MINERALS—LEASE—ROYALTIES—ACTIONS—BURDEN OF PROOF. In a suit for minimum royalties under a coal mining lease, for a term of years unless the coal should be sooner exhausted or it should be ascertained that merchantable coal sufficient in quantity to be profitably mined did not exist, the burden of proof is upon the lessees to show that reasonable search and exploration of the lands had been made for the purpose of determining the essential conditions.

APPEAL (456)—HARMLESS ERROR—CURE BY INSTRUCTIONS—TAKING PAPERS TO JURY ROOM. The fact that the jury took to the jury room a complaint containing two causes of action, between which the plaintiffs had been compelled to elect, would not constitute prejudicial error, where the court instructed the jury to disregard the cause of action which had gone out of the case by reason of the election.

TRIAL (88)—INSTRUCTIONS—CONFUSED OR MISLEADING INSTRUCTIONS. An instruction that a mining lease is so voluminous that it is only necessary to direct the jury's attention to a few of its provisions which are directly involved was not misleading, where many of its features were not germane to the issues, and the lease was in evidence and the jury was charged to decide the issues on all the evidence in the case.

MINES AND MINERALS—LEASE—ROYALTIES—ACTION FOR BREACH—INSTRUCTIONS. In an action for royalties under a mining lease, where there was evidence that one of the plaintiffs had ordered employees of the lessee off the lands after the suit was commenced, an instruction that the refusal to permit the defendant to prospect or occupy the lands would defeat the right of plaintiffs to recover royalties after that date, was not prejudicial, the instruction being made in the interest of defendant's rights.

ELECTION OF REMEDIES (3)—ACTS CONSTITUTING—PLEADING—CAUSES OF ACTION—DAMAGES FOR BREACH OF MINING LEASE. In an action for mining royalties, a requested instruction that plaintiffs could not recover therefor subsequent to the date of commencement of the action since they had elected to treat the contract as breached

[1]Reported in 201 Pac. 289.

13—117 WASH.

on that date, was properly refused where an amended complaint was filed nearly two years later claiming royalties up to the time of its filing.

APPEAL (464)—HARMLESS ERROR—INSTRUCTIONS—REFUSAL OF REQUESTS. Refusal of requested instructions is not prejudicial when they are substantially covered by those given, or are inappropriate under the rule as to the burden of proof.

JUDGMENT (54)—NOTWITHSTANDING VERDICT. A motion for judgment *non obstante veredicto*, and in the alternative for a new trial was properly refused where the evidence within the issues was such that the jury could readily have decided in favor of either plaintiffs or defendant.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered June 1, 1920, upon the verdict of a jury rendered in favor of the plaintiffs, in an action on contract. Affirmed.

*Kerr, McCord & Ivey,* for appellants.

*Flick & Paul (Peters & Powell,* of counsel), for respondents.

MITCHELL, J.—In February, 1910, plaintiffs, Angus J. Oliver and others, as owners, entered into a miner's lease of certain portions of sections 16, 17, 20, and 21, Township 39 N., R. 7 E., W. M., with defendant Alex Polson, for a term of years. For the purpose of this case the conditions of the lease were, substantially, a cash payment (which was made), with the right of entry for the purpose of coal mining and the making of any and all improvements on, and means of transportation on, any and all of the lands as might be necessary or convenient for searching for, working, getting, preparing, carrying away and disposing of the coal to be got from the lands. The lessee was given the right to the use of water, water-power, timber, rock, stone, and so forth, as found necessary or convenient in mining and transportation operations. Section 4 of the lease provides:

"The party of the second part shall pay to the parties of the first part, or their heirs and assigns, as royalties:

"1st: For pea coal and sizes above, sixty-five (65) cents per ton.

"2nd: For buckwheat coal, twenty-five (25) cents per ton.

"3rd: For rice coal, ten (10) cents per ton.

"4th: For all coal other than authracite mined and marketed, twenty-five (25) cents per ton.

"Long ton is contemplated in all cases.

"Such payments to be made for each ton that is mined and marketed from the said lands, during the term of this agreement, such mining and marketing to be done and royalties paid during the full term of this lease, to wit: the term of ninety-nine (99) years, unless the coal in said land shall be sooner exhausted or it shall be ascertained that merchantable coal does not exist thereon in quantities sufficient to be profitably mined."

Section 6 of the lease provides:

"The minimum amount of royalties to be paid by the second party under this agreement in any one year, after issuance of the patent, or in any event beginning not later than May 1, 1911, shall not be less than four thousand dollars ($4,000). If the royalties accruing under the provisions of this agreement for coal mined and marketed, shall aggregate in any one year less than the sum of four thousand dollars ($4,000) yet, nevertheless, second party shall pay to first parties or their assigns on account of royalties the full sum of four thousand dollars ($4,000), provided, however, that in the event the royalties accruing shall be less in any one year than the sum of four thousand dollars ($4,000), the difference between the royalties so accruing and the said sum of four thousand dollars ($4,000) shall be advanced and paid on account of royalties on coal to be mined and marketed in subsequent years, and if thereafter the royalties accruing in any one year shall exceed the sum of four thousand dollars ($4,000) there shall be deducted from

any such excess of royalties accruing, the sum or amount paid in any prior year, in excess of royalties accruing, in each year of payment; provided further, that except as hereinbefore in this paragraph limited, the parties of the first part shall be entitled to and shall receive from the second party, in addition to the sum of four thousand dollars ($4,000) per year, all royalties that may accrue in excess of that sum.''

Section 10 provides:

''The party of the second part shall begin the development of the coal deposits upon said lands hereinbefore described, within nine months from the date hereof and shall thereafter prosecute the same with reasonable diligence and shall mine and market the coal from said lands as rapidly and extensively as the conditions and the market for coal shall permit.''

The parties bound their heirs, representatives, assigns and successors in interest, jointly and severally, with permission to assign the lease as a whole to any party desired by the lessee, he being responsible nevertheless for the performance of the conditions and terms of the lease.

The lease was assigned by the lessee to the Washington Development Company, a corporation, of which the lessee is president and principal stockholder. Immediate possession was taken of the property, and thereafter, for a number of years, a large amount of money was spent in prospecting and attempting to develop the coal prospects on the lands and other lands adjacent thereto under the control of the lessee and his assignee within the so-called coal field. At the expiration of several years the lessee, claiming to be satisfied by his investigations and the advice of competent geologists, coal mining engineers and experts that the lands were destitute of merchantable coal in quantities sufficient to be profitably mined, abandoned the field, including the lands involved in this action, and gave

his lessors notice accordingly. The owners, having received no pay other than the cash consideration at the date of the contract, commenced this action against the defendants, Alex Polson and the Washington Development Company, on December 16, 1915, to recover twenty thousand dollars as minimum royalties for the years May 1, 1911, to May 1, 1915, and the further sum of one hundred thousand dollars for failure of the defendants to properly prospect the lands for coal and put them in producing condition, alleging the lands contained valuable deposits of coal capable of production in such quantities that royalties would far exceed $4,000 per annum during the term of the lease.

On November 5, 1917, the plaintiffs filed an amended complaint containing two causes of action separately stated. The one to recover twenty-eight thousand dollars claimed due under the contract for minimum royalties at $4,000 per annum from May 1, 1911, and the other to recover one hundred twenty thousand dollars damages for the failure of defendants to open and develop the coal mine or mines on the lands, alleged to have been available and sufficient in quantity and quality to warrant large profits in the market as conditions then existed, and to have reasonably furnished an output of four hundred tons daily, which would have made an average of twenty-five cents per ton royalty under the terms of the lease. To the amended complaint the defendants interposed a motion to require the plaintiffs to elect as between the first and second causes of action, on the ground, as claimed by the defendants, that they were inconsistent. The court required the plaintiffs to elect, and thereupon they chose their first cause of action, comprising the annual minimum royalties. In the amended answer to the amended complaint it is admitted that the defendant Washington Development Com-

pany is a corporation; that the lease between the parties, a copy of which was set out in the complaint, was entered into by the parties thereto; that it had been assigned by Alex Polson to the Washington Development Company, and that he is president and principal stockholder of the corporation. All other essential allegations of the amended complaint were denied, and affirmatively it was alleged that, at the date of the lease and at all times since, no coal in merchantable quality and sufficient quantity existed in the lands; that no consideration existed for the execution of the lease; that there has been a total failure of consideration for the lease; that royalties were to be paid only in the event coal existed in sufficient quantities to be profitably mined; and that no royalties in any sum whatever have accrued or have been owing from defendants, or either of them, to the plaintiffs. The reply denied the affirmative allegations in the amended answer.

There was a jury trial, which resulted in a verdict for the plaintiffs in the sum of twenty-eight thousand dollars. By consent of plaintiffs in open court, the defendant Washington Development Company, a corporation, was dismissed from the action. From a judgment on the verdict, with interest, defendant Alex Polson has appealed.

(1) The principal controversy in this case depends upon the construction of the lease, and consequently upon which side the burden of proof rested in the trial of the case. The jury was instructed that the burden of proof was upon the defendants to prove, by a fair preponderance of the evidence, that they made reasonable search and exploration of the lands in question for the purpose of determining the existence or non-existence of coal, and to prove, by a fair preponderance of the evidence, that merchantable coal

in sufficient quantities to be profitably mined does not
exist upon such lands. Appellant claims the instruc-
tion was erroneous and that the burden was on plain-
tiffs, who were not entitled to recover anything until
they fairly met the burden. Elaborate arguments
have been made and many authorities cited by res-
pondents' counsel upon this subject. It would be un-
profitable to write with attempted clearness upon all
such authorities.

In the annotation, p. 1078, L. R. A. 1917E, following
the decision in the case of *Bennett v. Howard,* 175 Ky.
797, 195 S. W. 117, L. R. A. 1917E 1075, by the Ken-
tucky court of appeals, it is said:

"It is very frequently provided in mining leases
that the lessee shall pay a designated royalty on a
certain tonnage of coal or ore produced, whether the
same is mined or not, and very frequently the lease
also contains a provision relieving the lessee of the
liability for this minimum royalty under designated
circumstances or conditions. In construing leases of
this character, the general rules for the construction
of contracts in general apply, and the provision will
be construed with due regard to the lease as a whole,
and in a manner to give effect to the intention of the
parties as shown by the entire lease and the surround-
ing facts and circumstances. In general, in order for
the lessee to avoid liability for the minimum royalty
reserved, by invoking the provision in the lease reliev-
ing him therefrom under designated circumstances, the
burden of proof rests upon him to show the existence
of the circumstances or conditions designated in the
lease as a ground for the suspension of the payment
of the minimum royalty reserved, and also to show
that the existence thereof is due to no fault on his
part, and that by reason thereof, the production or
mining of the minimum tonnage is not practicable.
*Bennett v. Howard, ante,* 1075; *New York Coal Co. v.
New Pittsburg Coal Co.* (1912), 86 Ohio St. 140, 99
N. E. 198; *Dorris v. Morrisdale Coal Co.* (1906), 215

Pa. 638, 64 Atl. 855; *Holt v. Kelley* (1909), 224 Pa. 620, 73 Atl. 947.''

The lands involved are situated in Whatcom county within what is commonly called the Mt. Baker district. For some years prior to the date of this contract there had been considerable prospecting, tunneling and drilling for coal in the district by a number of persons. There were certain indications of coal on portions of the leased lands, but there were no developed or well established coal mines, or coal properties in the entire district, and at that time, or indeed at the trial of this case nine years later, no coal had ever been sold from the entire district. No doubt all the parties to this contract thought there was profitable coal in the lands, but it seems to be clear that the appellant did not rely upon any representations or assurances thereof made by the respondents, nor on the terms of the lease itself, for as to the first he testified:

''At the time I went in in 1909 until 1911 I had the utmost confidence I was going to open up the first and the finest anthracite coal vein that was opened up on the Pacific Coast. I based that opinion on my engineer's report.''

Upon getting possession of this land, the appellant continued extensive explorations in the field at heavy expense, a part of which consisted of borings upon these particular lands, until reaching the conclusion that there was no coal in profitable quantities in the lands of the respondents, he notified them in April, 1912, that he would give up his lease on the property, after which it appears he did nothing more on these lands; and thereafter, about February, 1916, he abandoned the whole field, with reference to which he testified:

''I had absolutely no intention at any other time of ever returning there for the purpose of developing this

property. I was through with the field for ever, as far as I was concerned."

In the meantime, and prior to notifying the respondents of his intention to give up the lease, there is evidence to show there were negotiations at the instance of the appellant looking to an extension of time in which to pay the annual minimum royalties as provided for in the lease. Now, turning to the text or the terms of the lease, it is said by counsel for appellant in written argument:

"The lease itself recognized that it had not been ascertained or become known whether merchantable coal existed upon the leased lands."

The written lease does not assure the existence of coal in merchantable quantities, nor provide for compensation only upon condition that it is there in that kind and quantity, but, on the contrary, it was covenanted:

"Such mining and marketing to be done and royalties paid during the full term of this lease, to wit: The term of ninety-nine (99) years, unless the coal in said land shall be sooner exhausted or it shall be ascertained that merchantable coal does not exist thereon in quantities sufficient to be profitably mined."

The words in the alternative, viz: "or it shall be ascertained that merchantable coal does not exist thereon in quantities sufficient to be profitably mined" would be idle if appellants' present contention be allowed to prevail. The ignoring of those words would constitute a transgression of the rule requiring all the language of a written instrument to be taken into account in construing it.

The appellant undertook to pay annually a minimum amount of four thousand dollars, unless he could show that merchantable coal in paying quantities did not exist, and, for his protection, if he ascertained it did

so exist but it became exhausted within the term of ninety-nine years, he should then be released from liability.

The case of *Adams v. Washington Brick etc. Coal Co.*, 38 Wash. 243, 80 Pac. 446, cited by appellant, we think is not helpful here. In that case there was no question about the tract of land containing a quantity of clay suitable for the manufacture of brick. But the clay having become exhausted before the expiration of the term, the suit brought thereafter presented the question if the whole property or simply the clay substance was the real subject-matter of the lease, and it was decided that the latter was the controlling consideration and that, upon its becoming exhausted, a termination of the contract was effected. Nor do the cases of *Diamond Iron-Mining Co. v. Buckeye Iron-Mining Co.*, 70 Minn. 500, 73 N. W. 507, or *Gribben v. Atkinson*, 64 Mich. 651, 31 N. W. 570, cited in the *Adams v. Washington Brick etc. Coal Co.* case, and relied upon by appellants here, hold to the contrary, but as we understand, each of them holds, under its own particular facts and circumstances, that the non-existence of ore was a defense to an action to recover royalty. The situation is similar in principle to the case of *Wilson v. Beech Creek Cannel Coal Co.*, 161 Pa. St. 499, 29 Atl. 100, wherein it was said:

"If a test of the property was necessary, it was the duty of the lessee to make it. This is apparent from the following clause of the lease: 'It is further agreed that should said seam of coal prove faulty in the strata, or unmerchantable in its quality, so rendering it impracticable to mine or dispose of the same in reasonable quantity, the said lessees shall have the right to abandon the same, with the right to remove all the improvements by said lessee erected on or under said premises, but all advances of royalty paid for coal not mined shall be forfeited to said lessor.' It may be

that a condition such as is described in this clause
would constitute a defense to an action for the rent,
but the burden of showing that it exists lies on the
defendant company. It has the right to mine and dis-
pose of the coal in the Soult seam. In the exercise of
this right, it may develop a condition which will re-
lieve it from further liability under the lease; but the
lessor, having parted with his right to mine the leased
coal, is not in a position to acquire by his own efforts,
further information respecting the quality and quan-
tity of it.''

In the present case the court correctly interpreted
the lease in this respect and placed the burden of proof
on the appellant. This conclusion disposes of a large
number of assignments of error relating to instruc-
tions given and others requested by the appellant
which were refused by the trial court.

(2) The jury was permitted to take the amended
complaint to its room in deliberating on its verdict. It
contained the statement of the second cause of action
for damages in the sum of $120,000. It is urged by the
appellant that the possession by the jury of that por-
tion of the amended complaint was prejudicial to him.
The court, however, took care of the matter by in-
structing the jury to ''disregard the second cause of
action entirely, as *under the order of the court* the
plaintiffs have elected to proceed only upon the first
cause of action.''

(3) Exception was taken to an instruction that the
lease is voluminous but it is only necessary to direct
the jury's attention to a few of its provisions which
are directly involved, and it is claimed the court should
have instructed the jury to consider all the provisions
in the lease. The lease was admitted in evidence, be-
sides being plead and admitted, and in one of its in-
structions the court did tell the jury they must con-
sider and decide the issues on all the evidence in the

case. There was nothing misleading in the instruction given, but, on the contrary, it was perfectly proper for the sake of clearness to call the jury's attention, as the court did do, to those particulars of the lease that were directly involved, and certainly there were many of its features which were in no special way germane to the controversy or issues submitted by the pleadings and the evidence.

(4) There was evidence that, about September, 1916, one of the respondents ordered the employees of the appellant off the premises. The jury was instructed that, if satisfied by the evidence that the plaintiffs, or either of them, refused to permit the defendants or their agents to prospect and occupy the lands, the plaintiffs could not recover any minimum royalties accruing after that date. It is argued the instruction is unsound because it advises the jury that, if the plaintiffs breached the contract, they could nevertheless recover under the contract up to the time that they breached it, thus permitting them to take advantage of their own wrong. The argument singles out but one instruction which, when considered in connection with the rest of them, appears to have been intended to care for the rights of the appellant himself. Other instructions amply advised the jury upon the subject generally. The appellant had abandoned his lease long prior to the incident in question, and the whole theory of the defense in the submission of its evidence was that there was no merchantable coal in profitable quantities in the land. The incident referred to happened after the suit was commenced, and the appellants' agents were there, it appears, to gather evidence for the purpose of the trial.

(5) It is objected that the court refused to give a requested instruction that, by the commencement of the

action on December 16, 1915, the plaintiffs elected to treat the contract as breached on that date, and that in no event could the plaintiffs recover any minimum royalties for any period subsequent to that date. The argument is not convincing. In the first place, it was not affirmatively plead by the answer nor raised at any time before the verdict. The two causes of action were pleaded as one in the original complaint, in different amounts as to each from what they appeared in the amended complaint because of the added length of time the lease had to run. In both complaints the two causes of action were the same in substance though not in amounts. The one cause was for the minimum royalties, and the other was for the amount of royalties recoverable according to the schedule provided in the lease, had the appellant properly prosecuted the ascertainment, development and production of coal as it was claimed he was obligated to do, not for the whole term of the lease, but only those years for which it was sought to recover the minimum annual royalties then due. The legal effect was but a duplication of the causes of action or the inclusion of the one in the other. There was no claim of damages for the breach of the contract for the whole term of ninety-nine years, but both causes of action related only to damages for failure to comply with the obligations of the lease, upon the plans of payment therein provided, for the time or period from the date of the lease to the dates of the complaint and the amendment, respectively.

(6) Other claims of error predicated upon the court's refusal to give instructions requested by the appellant cannot be sustained, for either they were substantially covered by instructions that were given, or they were not appropriate because of appellant's mistaken view of the burden of proof.

(7) Finally, it is contended the motion for judgment

n. o. v. and, in the alternative, for a new trial should have been granted. While all the grounds for a new trial provided for in the statute were set out in the motion, the only one urged upon our attention on the appeal is the insufficiency of the evidence to justify the verdict. There is a large amount of evidence in the record both for and against the contention that merchantable coal in profitable quantities exists in the leased lands. Each side produced an array of distinguished and experienced scientists and coal mining experts, engineers and workers, who testified favorably to that side on the basis of both theory and actual and oftentimes repeated extensive examinations and investigations of the leased lands and the whole coal field. Many of the witnesses were familiar with market values of the different grades of coal, the costs of mining, and of the transportation rates prevailing during the period of time involved in the controversy. At the conclusion a situation was presented wherein the jury could easily, within the testimony, have decided the issues of fact in favor of either the respondents or the appellant without the risk of any possible proper interference at the hands of the court. Under such circumstances, the trial court did not commit error in denying the motion.

Concluding that the trial was fair, the judgment is affirmed.

PARKER, C. J., MACKINTOSH, TOLMAN, and MAIN, JJ., concur.