G.E.J. CORPORATION and M.F. Corporation, Appellants,

v.

URANIUM AIRE, INC., a corporation, et al., Appellees.

No. 16715.

United States Court of Appeals
Ninth Circuit.

Dec. 26, 1962.

Rehearing Denied Feb. 1, 1963.

Ryley, Carlock & Ralston, George Read Carlock, and John C. Ellinwood, Phoenix, Ariz., for appellant.

Tognoni, Parsons, Birchett & Gooding, and Joseph Art Birchett, Phoenix, Ariz., for appellee.

Before HAMLIN, JERTBERG and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

This is a suit to recover on an option for the sale of mining claims. The court below gave judgment for the plaintiffs and defendants appeal.

On January 12, 1956, appellees granted appellant, G. E. J. Corporation (GEJ), an option to purchase appellees' property. The option contained the following clause:

"4. During the option period, Purchaser agrees to mine not less than 8400 tons of ore of a minimum average grade of at least .14% U308, or, if the average quality of ore is higher than .14% U308, Purchaser agrees to mine such smaller tonnage of ore as shall have a value (according to the schedule of prices set forth in the AEC Domestic Uranium Purchase Program) of $75,000.00 at the mine site, without regard to haulage allowance; provided, however, that Purchaser shall not be required to mine ore having such value if to do so would be considered uneconomical by an ordinary prudent mining operator in the same and similar locality, or if to do so would be inconsistent with good mining práctice under the circumstances, or if it is prevented from doing so by circumstances not within its control; provided, however, that

even though the Purchaser could economically and consistent with good mining practices mine and stock pile ore having such value, it may elect not to so mine if it pays to Sellers in lieu thereof the sum of $75,000.00), [sic]. or such smaller amount, which together with the ore already mined or stock piled, shall equal $75,000.00 in value. * * * "

GEJ, the signatory optionee, was a corporation organized by the Christiana Oil Corporation (whose name was later changed to M. F. Corporation, hereinafter MF) for the purpose of entering into the option agreement. Having procured the option, GEJ then turned the property over to MF, which conducted approximately twenty-seven days of exploratory work upon it. Early in March, 1956 MF advised appellees that it did not want to acquire the property. On March 8, 1956 GEJ formally notified appellees that it did not intend to exercise its option and, at the same time, released and quitclaimed its interest in the property. Appellees immediately responded by advising GEJ that they considered it GEJ's duty "either to stockpile the ore as required in Paragraph 4 or to make the cash payment."

Neither performance forthcoming, on September 24, 1956, appellees commenced this action. Trial followed and the appellees were given judgment against GEJ and MF, jointly and severally, in the sum of $75,000.00, together with interest and costs. On this appeal the appellants specify as error the following: First, the ruling of the court regarding burden of proof; second, the court's finding that appellants did not meet the burden of proof thus imposed; third, the court's employment of the wrong measure of damages; fourth, the court's ruling that certain evidence was irrelevant; fifth, the court's ruling holding inadmissible a deposition; and sixth, the court's conclusion that MF was bound by the option agreement.

We have examined each of these assigned errors and find that none of them can be sustained.

Appellant's first point is. that the burden of proof was on the appellees to show that ore existed in such quantity and quality that mining it would be considered economical by an ordinary prudent mining operator, and would be consistent with good mining practice. The duty of GEJ to perform the promise contained in the option agreement depended upon the existence of ore of the value therein specified. This fact was a condition precedent to its liability. See Restatement, Contracts § 250(a) (1932). But was it incumbent upon the appellees to prove this fact existed, or upon appellants to prove that it did not? Generally a party must establish a fact which is essential to his claim or defense; but as Professor Wigmore points out, "still another consideration has been advanced for solving a limited number of cases, i. e. the burden of proving a fact is said to be put on the *party who presumably has peculiar means of knowledge* enabling him to prove its falsity if it is false." 9 Wigmore, Evidence § 2486, at 275 (3d ed. 1940). Professor Corbin is to the same effect. 3A Corbin, Contracts § 749, at 467 (rev. ed. 1960). The Supreme Court of Arizona has indicated it would apply this latter rule in a proper case. Calumet & Ariz. Mining Co. v. Winters, 25 Ariz. 483, 484, 219 P. 585, 588 (1923); Southwest Cotton Co. v. Ryan, 22 Ariz. 520, 533, 199 P. 124, 129 (1921); Durazo v. Ayers, 21 Ariz. 373, 382, 188 P. 868, 871 (1920).

We think that the nature of the subject matter dealt with in this option makes the transaction an exceptional one. As stated by a leading authority:

"Unlike other classes of real estate, the value of a mine cannot be determined by mere superficial observation. Expensive investigations, involving measurements, examination of underground geological conditions, and sampling invariably precede the consummation of a purchase or sale of mining property. In. order to justify an intending purchaser in making the requisite investigations and incurring the at-

tendant expense, he invariably exacts some contract from the owner by which he secures the first privilege of purchasing the property in the event the examination proves satisfactory." 3 Lindley, Mines, § 859, at 2124 (3d ed. 1914).

As part consideration for the option, GEJ promised to either mine or pay a fixed sum, this duty being conditional upon the value of the ore contained in the land. It secured to itself the sole and exclusive right to conduct the extensive exploration of the property necessary to collect the information that would establish the value of the ore. Under these circumstances, we think it reasonable to construe the option as implying a promise on the part of GEJ to pursue that exploration with reasonable diligence. This case is analogous to Stoddard v. Illinois Improvement & Ballast Co., 275 Ill. 199, 113 N.E. 913 (1916). From the facts in that case it appeared that plaintiff leased real property for a term of ten years, with rent or royalty based on the quantity of stone mined by the lessee. The court found that there was an implied covenant that the lessees would quarry stone with reasonable diligence if found, and so long as found in quantity and kind that it might be quarried at a profit. On the issue of burden of proof the court stated:

"The argument of [defendant] that the burden of proof was upon [plaintiff] to establish that the demised premises contained stone suitable for quarrying purposes which could have been profitably removed by due diligence and skill is not tenable. [Defendant] was in possession of the property and the quarrying machinery left there by the former lessees. * * * [Defendant] from the very nature of the case was or should have been in possession of all the facts to enable it to show that the quarry could not be operated

at a profit, and the law therefore placed that burden of proof on it as an affirmative defense."

Likewise, in the case at bar, if appellants did not have all the information necessary to enable them to prove that the condition precedent to their liability was not satisfied, if such was the fact, they should have had it, and therefore the law rightfully casts the burden of proof upon them. Accord, Hiller v. Walter Ray & Co., 59 Fla. 285, 52 So. 623 (1910); Wilson v. Beech Creek Cannel-Coal Co., 161 Pa. 499, 29 A. 100 (1894); Watson v. O'Hern, 6 Watts 362 (Pa.1837); Oliver v. Polson, 117 Wash. 385, 201 P. 289 (1921).[1]

The court's finding to the effect that appellants did not sustain their burden of proof presents a question of fact. In challenging this finding, appellants probe at great length into the testimony of appellees' witnesses and into the economics of mining ore. They point to a portion of the testimony and certain of the exhibits to show that the court was in error. However, appellants' argument is based on factual assumptions which the trial court was not bound to make. Our examination of the entire record discloses that in all material details the findings were adequately supported by the evidence. This court is not a trier of fact.

The option contained GEJ's promise to either mine a certain amount of ore or pay the sum of $75,000.00, and the lower court rested its award of damages upon GEJ's failure to do the latter. In support of their point that this was an improper measure of damages, the appellants advance two arguments: (1) that the contract was not a truly alternative contract, but primarily called for the mining of ore, and that the secondary obligation to pay $75,000.00 was manifestly a penalty, hence unenforceable; (2) that even if the contract was an alternative contract, damages ought to be determined in ac-

1. In Martin's Fork Coal Co. v. Harlan-Wallins Coal Corp., 14 F.Supp. 902, 909 (E.D.Ky.1934) the court entertained a contrary view, but it appears that the question was not fairly presented. The defendants' brief was so deficient that the court refused to consider a number of decisions whose relevancy was not explained.

cordance with the less valuable of the alternatives possible of performance at the time of breach; in this instance, the mining of ore.

We agree with the appellants that a contract which ostensibly permits a promisor to render one or the other of two or more performances is not truly alternative if the performances are of such unequal burden that it is unrealistic to suppose that the promisor would perform any but the easier. However, this does not necessarily make the secondary obligation a penalty. Rather, it may be a provision for liquidated damages and hence enforceable. Restatement, Contracts § 325, comment b (1932).

In our view, assuming that the contract was not alternative, the provision calling for the payment of $75,000 appears to be one for liquidated damages. At the time the contract was entered into the appellees' loss, if the property was not developed, was difficult, if not impossible, of calculation. In addition, the value of the ore which GEJ was to stockpile for appellees could not be estimated with any degree of certainty. Appellants point out that if the ore turned out to be of a .14% grade, the amount required to be mined would be worth $28,075.84. However, they do not dispute the appellees' contention that if the ore was of a .20% grade, the required amount would

be worth $50,750.00 and, if it was of a .40% grade, $63,457.00. Whether or not these figures are completely accurate, they guide us to the conclusion, which the record substantiates, that at the time the parties entered into the contract the damages consequent upon the breach of a duty to mine ore were impossible of accurate estimation and that the sum of $75,000.00 would be a reasonable forecast of those damages. If the contract was not alternative, the liquidated damages were $75,000.00, and they were correctly assessed in that amount.

Appellants' second argument is based on the assumption that damages are properly measured as of March 8, 1956, a date when both alternatives were equally possible of performance. But the option, by its terms, allowed GEJ to render performance at any time until April 9, 1956. If GEJ's surrender of its interest in the property and its election not to exercise the option, both of which occurred on March 8, 1956, had any operative effect it was as an anticipatory repudiation.

Some courts follow the theory that the repudiation of a contract obligation, prior to the time fixed for performance, is no breach until acted upon by the promisee,[2] while others adopt the view that it effects an immediate breach regardless of the response of the promisee.[3] How-

2. This theory is not entirely logical because it causes the "breach" to be effected by an act of the injured party. 5 Williston, Contracts § 1322 (rev. ed. 1937). Also it fails to explain why, if the injured party chooses to ignore the repudiation, he is not privileged to continue performance. See 5 Williston, Contracts § 1298 (rev. ed. 1937).

3. Although the writers seem to prefer this theory, it is as troublesome as the other. If an anticipatory repudiation is really a breach of contract, the defaulting party should not be able to nullify it by means of a retraction, yet the cases hold that he may, so long as the promisee has not materially changed his position in reliance on the repudiation. See 4 Corbin, Contracts § 980, at 930–31 (1951); Restatement, Contracts § 319(a) (1932). In addition, if it is a breach, the statute of limitations

should run from the time of repudiation, yet the cases are contrary. See 4 Corbin, Contracts § 989 (1951); Restatement, Contracts § 322 (1932).

The explanation that the "breach" is really of an implied promise not to repudiate the contract (5 Corbin, Contracts § 1053, at 260–61 (1951)), is subject to the same criticism, and points up the additional inconsistency of the theory with the fact that the measure of damages is not the loss occasioned by the repudiation, (depreciation of the assignment value of the contract) but is the loss occasioned by the failure to satisfy the promise of performance on the date specified in the contract. See 5 Corbin, Contracts § 1053, at 263 (1951); Restatement, Contracts § 338 (1932).

The Restatement recognizes that if an anticipatory repudiation is a breach, it does not have the incidents of an "ordin-

ever, under either theory we reach the same result.

If there was no breach until the performance was due on April 9, 1956, appellees were injured in the amount of the value of the performance on that date. See 5 Williston, Contracts § 1339 (rev. ed. 1937). On the other hand, if the repudiation constituted an immediate breach, still the measure of damages is the same. In re New York N. H. & H. R. R., 298 F.2d 761 (2d Cir. 1962); Reliance Cooperage Corp. v. Treat, 195 F.2d 977 (8th Cir. 1952); 5 Corbin, Contracts § 1053, at 260–63 (1951); Restatement, Contracts § 338, comment a (1932).

By the surrender and quitclaim of the property, GEJ had foreclosed its right to enter upon the property and mine ore.

"Even though the contract is so made as to give to the promisor power of discharging this contractual duty by the performance of any one of several alternatives, this power may have ceased to exist for any one of a number of reasons before the breach of contract occurs. Thus, if before the breach occurs all of the alternatives but one are eliminated by impossibility or illegality, the contract ceases to be an alternative contract. The promisor, who has had the choice among these alternatives, now has no choice; he must perform that one of the alternatives that remains possible and lawful, and damages for his breach of duty are measured in accordance with the single performance that is now required. This rule is applicable even though the impossibility arises by the voluntary action of the prom-

isor; but such action by him may be regarded as an election of the other alternative." Ibid.

On April 9, 1956, only one alternative remained possible of performance, the payment of $75,000.00, and this was the measure of appellees' damages.

■ Appellants' fourth point is completely untenable. They argue that a determination of " * * * what would be consistent with good mining practices under the circumstances" required consideration of the circumstance that GEJ was on the property for exploration purposes; and that the trial court erred in ruling that evidence as to the effect of that circumstance was not relevant. However, the trial judge admitted all such evidence, saying: "I am going to hear it, but presently I don't accept your construction of it at all. I will hear the witness on it but you have got a lot of persuasion to get me to buy that argument." This was not a ruling that the evidence was irrelevant but, on the contrary, it was an express reservation of opinion on that question.

■ The appellant next specifies as error the rejection of the deposition of one Malcolm B. Gould. His statement, if admitted, would have tended to show that a company which later exploited the property, had not found the operation profitable. The trial court rejected the deposition on the ground that it was not signed and filed as prescribed by Rule 30 of the Federal Rules of Civil Procedure, and that it was not admissible under the qualification to that rule permitting reception where the deponent is shown to have refused to sign it.[4] The court ruled

ary breach." Restatement, Contracts § 318, comment d (1932). This being the case perhaps it would be better not to explain the doctrine of anticipatory repudiation by means of normal contract analysis, but simply to recognize that it is an exceptional doctrine based upon social policy.

4. Rule 30 states as follows:

"(e) Submission to Witness; Changes; Signing. When the testimony is fully

transcribed the deposition shall be submitted to the witness for examination and shall be read to or by him, unless such examination and reading are waived by the witness and by the parties. * * * The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the witness, the officer shall sign it and state on the record the fact of the waiver or of

that the conduct of the deponent did not amount to a refusal to sign the deposition, and the appellants challenge this ruling. However, we find it unnecessary to consider appellants' point because even if the deposition was sufficient in form it was properly refused.

Prior to the offer of the deposition Gould had appeared in person, testifying as one of appellees' witnesses on rebuttal. Appellants had not cross-examined him at that time, but had consented to his being excused. It was later, during surrebuttal, that they sought to introduce Gould's deposition, asserting that the witness could not have been cross-examined on the subject earlier because it was not within the scope of his direct examination.

Depositions may only be used where the witness is unavailable or where exceptional circumstances necessitate their use. Rule 26(d) contemplates such use and was not intended to permit depositions to substitute at the trial for the witness himself. The appellants could have secured Gould's continued presence at the trial in order to later elicit his oral testimony on the matter in question. Instead, they allowed him to be excused. Their argument to the effect that at the time Gould was excused they had no idea that they would need his testimony is not valid. The subject of his testimony related to a major issue in the case upon which appellants bore the burden of proof. We see no reason why the pre-trial deposition of a witness should be admissible when the witness is himself present. See Klepal v. Pennsylvania Railroad Co., 229 F.2d 610 (2d Cir. 1956) (Clark, C. J.).

The court not only held GEJ liable for breach of the contract, but also MF, on the theory that, although MF did not sign the contract, GEJ was its alter-ego. In arguing that GEJ was not its alter-ego, MF contends that the findings of fact relating to this point are not supported by the evidence; but that even if they are, the elements of an alter-ego relationship are not satisfied. In support of its position MF emphasizes the fact that, by using GEJ as a conduit for the purchase of the property, it was attempting to gain for itself the federal income tax advantages of what is generally known as the "ABC plan," [5] and that the

---

the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed * * *.

"(f) *Certification and Filing by Officer; Copies; Notice of Filing.* (1) The officer shall certify on the deposition that the witness was duly sworn by him and that the deposition is a true record of the testimony given by the witness. He shall then securely seal the deposition in an envelope indorsed with the title of the action and marked 'Deposition of * * *' and shall promptly file it with the court in which the action is pending or send it by registered mail to the clerk thereof for filing. * * *"

5. Appellants explain the "ABC plan" as follows:

"A owns a uranium property which he wants to sell for $1,000,000.00. C is a corporation which is in the business of operating such properties and is willing to buy it, but thinks the $1,000,000.00 price is more than should be paid in view of the certain prospect that C will pay income taxes at the rate of 52% on almost all its income, subject to a 15% depletion allowance (26 USC 613), so that C will have to make a profit from its operation of the property of almost $2,000,000.00 in order to get back after taxes what it has paid for the property, even without any profit.

"But if the transaction could be so arranged that the return of the $1,000,000.00 paid for the property was not income taxable to C, but to some other taxpayer who had deductions to apply against it to reduce the tax, the purchase price of the property could be paid to A out of a much smaller part of the total expected production of the property, and there would thus be more left after taxes for C. If, for example, B, a person not already in the transaction, owns a reserved production payment to be paid out of the first ore from the mine, [an economic interest in the ore, in place, which is depleted by production], the amount paid to B in discharge of such reserved production payment is B's income, and not A's, and B has a separate interest in the property which entitles him to a depletion allowance. See Thomas v. Perkins, 301 U.S. 655, 81 L.Ed. 1324.

successful utilization of this plan required that they be separate entities. However, even if it is correct that GEJ and MF were independent for purposes of tax liability, it does not necessarily follow that the same is true for purposes of contract liability. Tax law is inapplicable. Whether MF's indirect dealing amounted to its entry into a contractual relationship with appellees is properly governed by the law of the place where the contract was executed. Cf. 11 Am. Jur. Conflicts §§ 28, 187 (1937); see Goodrich, Conflicts § 110, at 322 (3d ed. 1949). That place was California.

 Generally a corporation which owns and controls another is not responsible for the liabilities of the latter. But this rule is not without exception, and if the subsidiary is the alter-ego of the parent the fact of separate corporate existence will be disregarded. California law establishes two requirements for an alter-ego relationship; first, that the subsidiary is not only influenced and governed by the parent, but that there is such a unity of interest and ownership that their individuality, or separateness has ceased; second, that the facts are such that an adherence to the normal attributes of separate corporate existence would sanction a fraud or promote injustice. Minifie v. Rowley, 187 Cal. 481, 487, 202 P. 673, 676 (1921); Thomson v. L. C. Roney & Co., 112 Cal. App.2d 420, 427–28, 246 P.2d 1017, 1021 (1952); Duarte v. Postal Union Life Ins. Co., 75 Cal.App.2d 557, 577, 171 P.2d 574, 586 (1946); Marr v. Postal Union Life Ins. Co., 40 Cal.App.2d 673, 681–82, 105 P.2d 649, 654 (1940).

The trial court's findings are supported by substantial evidence and satisfy the requirement of unity of interest and ownership. GEJ was organized by MF not only for the purpose of obtaining tax savings, but also for the purpose of insulating itself from liability on the option. Although MF's attorneys were ostensibly in control of the new corporation, being GEJ's sole directors and stockholders, MF retained actual control of GEJ and made all important decisions with respect to the transaction. The capital of GEJ consisted of the demand notes of its directors, totaling only $1,000.00 and on which only $300.00 was paid, and GEJ had no income during the option period; therefore, MF paid the $10,000.00 consideration for the option, the expense of exploring the property, and other operating expenses. It is clear from the foregoing that GEJ conducted no independent business, but was owned, controlled, and operated by MF to serve as a conduit for the latter's purchase of the property.

Not only was there unity of interest and ownership, but the second requirement for an alter-ego relationship is also

B's depletion allowance would be either 15% of gross income or an amount proportionate to his basis for his depletable property.

If in this example A sold the whole property to B for $1,000,000.00, and B sold it to C for a small price, reserving to himself a production payment of $1,000,000.00, or if A sold a production payment to B for $1,000,000.00 and the rest of the property to C for a nominal price, B would receive $1,000,000.00 from the property, all taxable income to him, but his total deductions for cost depletion would also equal $1,000,000.00 during the whole period of the receipt of the money, and he would have no tax to pay. $1,000,000.00 worth of production would thus have returned to B the amount of purchase price for the whole property. A, the owner, would have his $1,000,000.00.

C, the operator, would have the property, its purchase price paid out of $1,000,000.00 worth of production instead of out of production sufficient to pay all costs and further to produce a before-tax profit of about $2,000,000.00.

"By this means, C can claim percentage depletion when he starts realizing some income from the property, after B's production payment is satisfied, and B can recover the $1,000,000.00 cost of the property by the use of cost depletion. Whereas if C had purchased the whole property directly from A, C would have had to take its choice—recover $1,000,000.00 by cost depletion over the entire life of the property, or recover 15% of gross each year, with the $1,000,000.00 invested in the property representing nothing either depreciable or depletable."

757

satisfied. The appellees have a meritorious claim and it would be unjust to allow MF to escape liability by operating through a puppet corporation organized with insufficient capital to meet its prospective liabilities. The injustice of such a result is further aggravated by MF's assurances that it would back up GEJ's obligations.[6] See Stark v. Coker, 20 Cal. 2d 839, 846–47, 129 P.2d 390, 394–95 (1942).

However, MF argues that appellees may not successfully maintain this action against it because they knew of GEJ's lack of adequate capital, yet they accepted GEJ as the contracting party. A similar argument was made in Hiehle v. Torrance Millworks, Inc., 126 Cal.App. 2d 624, 272 P.2d 780 (1954). In that case a corporation borrowed money from the plaintiff, its bookkeeper. The amounts were not paid when due, and the plaintiff brought suit against both the corporation and its two stockholders. The court found the stockholders liable, recognizing the rule that the alter-ego doctrine should not be applied where the plaintiff dealt with the corporation having full knowledge of the facts and where considerations of equity and fair dealing do not require application of the doctrine in his behalf. However, the court observed, although the plaintiff knew that he was dealing with the corporation rather than its stockholders, the latter induced him to make the loans by book entries which tended to picture the corporation's finances in a better light than the facts warranted. The court gave judgment for the plaintiff, stating: "It is not a question whether plaintiff was actually defrauded but whether he is bound to accept as facts the illusions the defendants created."

The case at bar is similar to the Hiehle case in that here there were misrepresentations which, while perhaps not amounting to fraud, induced appellees to enter into the transaction. Because of the assurances that MF would back up GEJ it is not the appellees that are estopped; but it is MF that is estopped to deny its liability on the contract. See Id. at 630, 272 P.2d at 784. Considerations of equity and fair dealing require the application of the alter-ego doctrine on appellees' behalf.

The judgment of the District Court is affirmed.

---

6. The trial court's finding, adequately supported by the evidence, is that:

" * * * When concern was expressed by the representatives of [appellees] because a newly formed stranger corporation was being proposed as optionee and because [MF] was proposed not to be included as a party to the option agreement, Volk and Holloway assured the representatives of [appellees] that, while [MF] could not sign Exhibit No. 1 without losing the tax advantages it desired to obtain, nevertheless [MF] would be responsible for GEJ Corporation's obligations contained in the option agreement and would stand behind GEJ Corporation in the performance of the option agreement."