**UNITED PAPERWORKERS INTERNA-
TIONAL UNION et al.**

**v.**

**PENNTECH PAPERS, INC., et al.**

**Civ. A. Nos. 77–78 ND and 77–113 ND.**

United States District Court,
D. Maine, N. D.

Oct. 21, 1977.

John J. Flaherty, Preti & Flaherty, Portland, Me., for plaintiffs.

Sidney St. F. Thaxter, II, and Raymond G. McGuire, Curtis, Thaxter, Corey, Lipez & Stevens, Portland, Me., John W. Ohlweiler, and James S. Frank, Simpson, Thacher & Bartlett, New York City, for defendants.

## OPINION

BOWNES, District Judge, By Designation.

This action is brought pursuant to Section 301 of the Labor Management Relations Act of 1947, as amended. 29 U.S.C. § 185.

Plaintiffs are United Paperworkers International Union and its Locals Nos. 36 and 37, International Brotherhood of Firemen and Oilers, Local No. 270, and International Brotherhood of Machinists and Aerospace Workers, Local 559. The defendants are Kennebec River Pulp and Paper Company, Inc., Penntech Papers, Inc., Maine Guarantee Authority, and T. P. Property Corporation.

The issue to be decided is whether Penntech Papers, Inc., which was not a signatory, can be ordered to arbitrate certain provisions of a collective bargaining agreement entered into between the plaintiff Unions and the defendant Kennebec.

### Background and Procedural History

The precipitating cause of this law suit was the March 29, 1977, closing of the Kennebec Paper Mill in Madison, Maine. Penntech, through its subsidiary, TP, had acquired all of Kennebec's outstanding capital stock on March 3, 1976. The mill at Madison, which had been shut down since December 20, 1975, was then reopened by Kennebec, but was shut down permanently on March 29, 1977.

The original complaint was filed on April 20, 1977. On April 21, the court issued a temporary restraining order prohibiting the defendants from removing or dissipating any of the property and assets of the defendants located at the Kennebec Mill site. This order was continued by consent of the parties until June 6, 1977. On June 7, the defendants posted surety bonds totalling

$175,000, and the temporary restraining order was dissolved. Prior to the termination of the temporary restraining order, Kennebec agreed to and did enter into collective bargaining with the plaintiffs relative to wages, vacation pay, severance pay, pensions, insurance benefits, and other claims made by the plaintiffs under the Union contract.

On July 13, the plaintiffs brought a separate action against TP which is now consolidated with the original action. No one has appeared for the Maine Guarantee Authority, and, since it does not have any role in the present proceedings, it will be ignored.

The resolution of the issue as to whether Penntech can be forced to arbitrate under the collective bargaining agreement requires a careful examination of the corporate relationship between Penntech, Kennebec, and TP, as well as an analysis of the pertinent law.

## THE FACTS

All of the pertinent facts have been stipulated by the parties. What follows is my summary.

Penntech is a Delaware corporation which owns and operates a mill located in Johnsonburg, Pennsylvania. Its principal corporate offices are located at 600 Third Avenue, New York City. TP is a Delaware corporation organized and owned by Penntech which was incorporated on May 12, 1975. At the time of its incorporation, TP's sole activity was an unsuccessful attempt to purchase a parcel of land in Pennsylvania. TP had no further activity until it acquired Kennebec on March 3, 1976. Every officer or director of TP is also an officer or director of Penntech.[1]

Penntech and TP share the same corporate headquarters. The title on the door reads only "Penntech Papers, Inc." No portion of the office contains separate space for TP. TP has no separate employees or furniture of its own. It is not a party to the lease for the New York headquarters, nor does it pay salaries to any of its officers.

TP does not employ legal counsel on a regular retained basis, but only when needed, and, in the past, such counsel has been the same as used by Penntech.

Kennebec was incorporated in the State of New York on January 9, 1959. On January 1, 1975, it changed its domicile from New York to Maine. In 1959, Kennebec had acquired the Madison Mills Division of the Economy Corporation, which became Kennebec's headquarters and is the locus of the current dispute.

Kennebec and the plaintiff Unions have been parties to a series of collective bargaining agreements since at least 1961. The present collective bargaining agreement between Kennebec and the plaintiffs covers employees represented by all four Unions.

In 1971, all of the outstanding capital stock in Kennebec was owned by ten educational and charitable institutions. On September 14, 1971, Kennebec effected a $4,953,900 sale and lease-back financing agreement in order to finance the rebuilding of Kennebec's Number One Paper Machine. On March 13, 1973, Southeastern Capital Corporation, a Tennessee corporation headquartered in Atlanta, Georgia, acquired all of the outstanding stock of Kennebec. At the same time, the lease-back agreement and other financial arrangements were amended to lengthen the period for repayment.

1. Penntech's directors are: John Leslie, John C. Beck, Peter M. Leslie, Richard H. Tatlow, IV, and Merril J. Dodge. Penntech's officers are: John Leslie, President; Merril J. Dodge, Vice-President for Marketing; William B. Ford, Vice-President for Finance and Secretary; Stephen D. Weinroth, Vice-President for Corporate Development; T. T. Mason, Vice-President for Capital Projects; Steven D. Bittel, Corporate Controller; and Georgie A. Penrose, Treasurer.

The directors of TP are: John Leslie, William B. Ford, and Stephen D. Weinroth. Its officers are: John Leslie, President; William B. Ford, Vice-President; Stephen D. Weinroth, Vice-President and Secretary; and Georgie A. Penrose, Treasurer.

Kennebec lost over $8,000,000 on sales of $55,000,000 in the years 1971–1975. On December 20, 1975, Kennebec discontinued operations and laid off all of its employees except for a skeleton force.

TP acquired all of Kennebec's outstanding capital stock on March 3, 1976, as provided in a Stock Purchase Agreement dated March 2, 1976, between Kennebec, SCC and TP. Kennebec then recalled the laid off employees and recommenced operations. Immediately following TP's acquisition of Kennebec's stock, its Board of Directors was filled by Penntech people.[2]

TP's only assets other than the stock of Kennebec were two parcels of timberland which it acquired subsequent to its purchase of Kennebec and which had previously belonged to Kennebec. TP financed no enterprise other than Kennebec and its current income, if any, derives solely from the sale of its assets.

Prior to its acquisition of Kennebec stock in March of 1976, TP's liquid assets consisted of several hundred thousand dollars obtained by way of an advance from Penntech for the purpose of acquiring Kennebec's stock. TP and Penntech participated in negotiations with Kennebec's creditors which resulted in a write down of Kennebec's debt with four major secured creditors. Penntech guaranteed approximately 25% of the amount due on a nonaccelerated basis as a write down. Neither Penntech nor TP guaranteed Kennebec's debt to other creditors.

Both Penntech and TP were aware of the existence of the collective bargaining agreement in effect between Kennebec and the plaintiff Unions. There were discussions between the officers and directors of Penntech and TP relative to the labor contract prior to the stock purchase. They felt that "certain changes in the contract would be desirable." Ford Dep. at 48, Stip. 16 at 9. Among the desired changes which were conveyed to Kennebec in written form, was a recommendation that the length of time during which the agreement would be in effect be extended. The March 1, 1976, Labor Agreement between Kennebec and the Unions also provided for the revamping of the Kennebec pension plan to comply with the Employee Retirement Income Stabilization Act (ERISA).

Penntech also retained Maine counsel who were the same as represented Kennebec in other matters.

On March 3, 1976, the same day on which TP purchased all of the outstanding stock of Kennebec, TP also advanced $101,000 to Kennebec in exchange for two demand notes in the amount of $100,000 and $1,000 respectively. TP made subsequent advances to Kennebec as evidenced by Kennebec's demand note dated December 31, 1976, in the amount of $2,700,000.

On May 9, 1975, when the 1970 labor contract between Kennebec and the plaintiffs expired, an agreement was executed in which Kennebec and the plaintiffs agreed to defer negotiation of a new labor contract. On November 1, 1975, Kennebec and the plaintiffs entered into a collective bargaining agreement covering the period from November 1, 1975, to June 30, 1977. This was superseded on March 1, 1976, by an agreement which was effective retroactive to January 31, 1976. The Labor Agreement was administered by Kennebec personnel, primarily by John McLeod, Kennebec's Manager of Industrial Relations who had been an employee of Kennebec prior to its acquisition by TP.

---

**2.** Immediately following the acquisition of Kennebec stock by TP, Kennebec's directors were: John Leslie, William B. Ford, and Robert S. Marlina. Kennebec's officers were: Allan J. Nadeau, President; William B. Ford, Vice-President, Secretary, and Treasurer; Steven D. Bittel, Corporate Controller; and Fred C. Scribner, Jr., Esq., Clerk. Except for the Clerk-Attorney, all of the above were previously associated with Penntech.

Since February, 1977, the directors of Kennebec have been: John Leslie and William B. Ford. The officers of Kennebec have been: Bruce St. Ledger, President; William B. Ford, Vice-President, Secretary and Treasurer; Steven D. Weinroth, Vice-President; Steven D. Bittel, Corporate Controller; and Robert E. Stevens, Esq., Clerk.

In 1976, plaintiffs sought arbitration with Kennebec once. They did not seek arbitration with Penntech or TP at any time prior to this suit.

During the period between March, 1976, and March, 1977, Kennebec maintained its own corporate books of account, its own personnel, payroll, tax and other corporate records at its headquarters in Madison. The corporate minute books and stock books were maintained by Kennebec's clerk, and Kennebec maintained its own bank accounts at two banks in the State of Maine. All payments to employees covered by the collective bargaining agreement were made from a Kennebec bank account. Kennebec filed its own separate withholding tax returns. Matters involving production, scheduling, maintenance, and other operating problems and procedures were left to the direction of Kennebec management. All accounting, bookkeeping, payroll, and other clerical functions were performed by Kennebec employees, and all design, engineering, and maintenance were performed by Kennebec employees. Kennebec obtained and maintained all operating licenses and permits and handled all other regulatory matters. All relations with the employees covered by the collective bargaining agreement were handled by Kennebec's Office of Industrial Relations, including the hiring of personnel, grievance proceedings, insurance enrollment, and processing of workmen's compensation claims, retirement, and termination.

The salaries of Ford and Weinroth, Penntech personnel, were paid by Penntech, and charges were made for their use to Kennebec. William Picard, Penntech's former Mill Manager, was assigned to work as full-time plant manager, but he continued to be paid by Penntech so that he would continue to receive Penntech's fringe benefits. Kennebec was charged for his use by Penntech.

Kennebec's work force and products remained substantially the same before and after the stock purchase by TP. Its financial condition did not improve. Based on unaudited financial information, Kennebec had a net loss of approximately $3,000,000 on net sales of approximately $10,000,000 during 1976, and a net loss of approximately $750,000 in the first two months of 1977. Kennebec shut down its mill on March 29, 1977, and indefinitely laid off most of its employees.

Based on the foregoing facts, I find that, starting on or before March 3, 1976, Penntech effectively controlled the operation of TP, and that TP was, for the purposes of this case, merely an alter ego of Penntech.

## THE LAW

### A. *Liability of a Successor Corporation*

█ The law is now clear that a successor corporation may be compelled to arbitrate the terms of a collective bargaining agreement between its predecessor and the duly elected representative of the employees in some circumstances.

In *John Wiley & Sons v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Court held that a successor employer was required to arbitrate with a Union representing its predecessor's employees under a collective bargaining agreement.[3] In *Wiley*, Interscience Publisher's, Inc., had entered into a collective bargaining agreement with the plaintiff Union. The agreement contained no express provision that made it binding on Interscience's successors or assigns. *Id.* at 544, 84 S.Ct. 909. Interscience "merged with . . . John Wiley & Sons, Inc., another publishing firm, and immediately ceased to do business as a separate entity." *Id.* at 545, 84 S.Ct. at 912. The surviving corporation, John Wiley & Son, Inc., continued the prior operation of Interscience without substantial change and with the same employees. The Court held:

We hold that the disappearance by merger of a corporate employer which has

3. Defendant argues that *Wiley* has been distinguished into all but oblivion and that it should be limited to its express facts. I note, however, that the Court has only recently referred to *Wiley* with favor in *Nolde Bros., Inc. v. Bakery Workers*, 430 U.S. 243, 250, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977).

entered into a collective bargaining agreement with a union does not *automatically* terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement. *Id.* at 548, 84 S.Ct. at 914.

The obvious, and most important, distinction between *Wiley* and the case presented here is that, while Interscience disappeared as a corporate entity in *Wiley*, Kennebec continued as the operating company even after Penntech took control of it. As a result of the merger in *Wiley*, there was no employer except the successor corporation with whom the Union could arbitrate. Here, Kennebec is not only available for arbitration, but has agreed to it. I recognize, of course, that arbitration with Kennebec may be an exercise in futility because of its trembling financial position and the reason that the plaintiffs seek to have Penntech as an arbitration target is because it is financially able to pay any award.

In assessing the applicability of *Wiley* to this situation, it is important to determine what kind of circumstances surrounding the corporate-labor relationship require that a successor corporation assume the responsibilities of its predecessor.

Among the issues on which the Union sought arbitration in *Wiley* was the successor's obligation to make pension fund payments mandated by the bargaining agreement. This, and termination benefits arising from the agreement, are what the plaintiffs seek to determine by arbitration here.

In *Wiley*, the Court reasoned:

[A]lthough the duty to arbitrate . . . must be founded on a contract, the impressive policy considerations favoring arbitration are not wholly overborne by the fact that Wiley did not sign the contract being construed. *Id.*, 376 U.S. at 550, 84 S.Ct. at 915.

In *N.L.R.B. v. Burns International Security Service, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), the Court distinguished the rule enunciated in *Wiley* from a situation in which the N.L.R.B. sought to hold a successor corporation liable for its predecessor's unfair labor practice. In holding that Burns had a duty to bargain with the Union, the Court also carefully explained:

It does not follow . . . from Burns' duty to bargain that it was bound to observe the substantive terms of the collective-bargaining contract the union had negotiated with Wackenhut [the predecessor corporation] and to which Burns had in no way agreed. *Id.* at 281–282, 92 S.Ct. at 1579.

*Wiley* was further distinguished on the grounds that *Burns* arose from an unfair labor charge while *Wiley* arose under a Section 301 action. *Id.* at 285–286, 92 S.Ct. 1571.[4] An additional distinction was that *Burns* did not involve the duty to arbitrate. *Id.* at 286, 92 S.Ct. 1571. The present case involves a Section 301 action with the principal question being the duty of the successor to arbitrate.

4. "We do not find *Wiley* controlling in the circumstances here. *Wiley* arose in the context of a § 301 suit to compel arbitration, not in the context of an unfair labor practice proceeding where the Board is expressly limited by the provisions of § 8(d) [of the N.L.R.A]. That decision emphasized '[t]he preference of national labor policy for arbitration as a substitute for tests of strength before contending forces' and held only that the agreement to arbitrate, 'construed in the context of a national labor policy,' survived the merger and left to the arbitrator, subject to judicial review, the ultimate question of the extent to which, if any, the surviving company was bound by other provisions of the contract.

"*Wiley's* limited accommodation between the legislative indorsement of freedom of contract and the judicial preference for peaceful arbitral settlement of labor disputes does not warrant the Board's holding that the employer commits an unfair labor practice unless he honors the substantive terms of the pre-existing contract. The present case does not involve a § 301 suit; nor does it involve the duty to arbitrate." *Burns* at 285–286, 92 S.Ct. at 1581 (cite omitted).

In *Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board, Hotel, Restaurant Employees*, 417 U.S. 249, 260, 264–265, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), a Section 301 suit, the Court held that a corporate successor was not obligated to arbitrate disputes between its predecessor and the Union. The Court distinguished *Wiley* on two grounds: first, that the original corporation continued in business, second, and more importantly, that Howard Johnson, though it was operating on the same premises, "hired only nine of the 53 former Grissom employees and none of the Grissom supervisors." *Id.* at 26, 94 S.Ct. at 2242.

In the present case, the same force is performing the same functions at the same location. The *Howard Johnson* exception does not take this case out of the ambit of *Wiley*.

The Supreme Court has not been completely consistent in maintaining the distinction between Section 301 actions and unfair labor practice actions. In *Golden State Bottling Co., Inc., v. N.L.R.B.*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), which was an unfair labor practice case, the

Court did impose successorship liability. While I cannot completely rationalize the divergent holdings in *Burns* and *Golden State*, neither of them lessen the impact of *Wiley* on this case.[5] Although *Burns* suggests that a corporation is not committing an unfair labor practice by failing to arbitrate under its predecessor's contract, *Wiley* makes it clear that a successor may be required to honor the terms of its predecessor's contract in a Section 301 suit under the proper circumstances.

The issue then is whether Penntech, by acquiring Kennebec's stock and by playing an active role in Kennebec's business, became a successor corporation subject to the *Wiley* rule.

The Supreme Court has not fashioned a rule which distinguishes between mergers, consolidations, and the purchase of stock as far as successor corporations and arbitration is concerned. Nor has it pierced through the entity of a subsidiary operating company to compel the acquiring parent corporation to arbitrate with a Union that has signed a collective bargaining agreement with the subsidiary.[6] I must, there-

---

5. Several factual differences are important, however. The unfair labor practice charged in *Golden State* was an act of individual discrimination which occurred before the corporate takeover and of which the successor was aware prior to the takeover. In *Burns*, the charged unfair labor practice was the failure to arbitrate itself. In essence, *Burns* held that a successor corporation is not committing an unfair labor practice by failing to arbitrate under a predecessor corporation's contract. This is distinguished from *Golden State* where the predecessor corporation had committed the unfair labor practice. Perhaps even more important equitably, if not logically, was that the Court was dealing with an individual's rights in *Golden State* who would have no remedy if arbitration were denied. In *Burns*, although the successor corporation did not commit an unfair labor practice by refusing to arbitrate under the old contract, it was ordered to bargain with the old Union. *Burns*, 406 U.S. at 281, 92 S.Ct. 1571. The employees were not left without recourse or effective representation.

6. *Wiley*, standing alone, could arguably require arbitration by Penntech even though there was no merger:

It would derogate from "the federal policy of settling labor disputes by arbitration," *United*

*Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, [80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424] if a change in the corporate structure or ownership of a business enterprise had the automatic consequence of removing a duty to arbitrate previously established; this is so as much in cases like the present, where the contracting employer disappears into another by merger, as in those in which one owner replaces another but the business entity remains the same. *Wiley*, 376 U.S. at 549, 84 S.Ct. at 914.

But in *Golden State, supra*, 414 U.S. at 182–183 n.5, 94 S.Ct. at 424 the Court recognized specifically that its rule had gone well beyond the traditional state tests for when a corporate veil may be pierced in a successor corporation situation.

We recognize that, unlike the situation in *Wiley* where state law provided some support for holding the successor by consolidation liable . . . the general rule of corporate liability is that, when a corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities, except where (1) the purchaser expressly or impliedly agrees to assume the obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability.

fore, turn elsewhere to determine whether Penntech is obligated to arbitrate.

■ Whether or not the corporate veil between Kennebec and Penntech should be pierced and the separate corporate entities disregarded is to be determined by the developing federal common law relative to Section 301 actions with an eye towards the state law's view of how separate corporations in these circumstances are to be treated.

Federal law, fashioned "from the policy of our national labor laws," controls. *Textile Workers Union v. Lincoln Mills,*

> . . . The perimeters of the labor-law doctrine of successorship, however, have not been so narrowly confined. . . . Successorship has been found "where the new employer purchases a part or all of the assets of the predecessor employer, *NLRB v. Interstate 65 Corp.,* 453 F.2d 269 (CA6 1971); [and] where the entire business is purchased by the new employer, *NLRB v. McFarland,* 306 F.2d 219 (CA10 1962) . . . ." *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 306, [92 S.Ct. 1571, 1591, 32 L.Ed.2d 61] (1972) (opinion of Rehnquist, J.); *see id.,* at 291 [92 S.Ct. 1571, 1584] (opinion of the Court). The refusal to adopt a mode of analysis requiring the Board to distinguish among mergers, consolidations, and purchases of assets is attributable to the fact that, so long as there is a continuity in the "employing industry," the public policies underlying the doctrine will be served by its broad application.

The Court further refined *Wiley* in *Howard Johnson, supra,* 417 U.S. at 257, 94 S.Ct. at 2240–41.

> Although it is true that both *Wiley* and this case involve § 301 suits to compel arbitration, the similarity ends there. *Wiley* involved a merger, as a result of which the initial employing entity completely disappeared. In contrast, this case involves only a sale of some assets, and the initial employers remain in existence as viable corporate entities, with substantial revenues from the lease of the motor lodge and restaurant to Howard Johnson. Although we have recognized that ordinarily there is no basis for distinguishing among mergers, consolidations, or purchases of assets in the analysis of successorship problems, *see Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 182–183, n.5, [94 S.Ct. 414, 424, 38 L.Ed.2d 388] (1973), we think these distinctions are relevant here for two reasons. First, the merger in *Wiley* was conducted "against a background of state law that embodied the general rule that in merger situations the surviving corporation is liable

353 U.S. 448, 456, [77 S.Ct. 912, 918, 1 L.Ed.2d 972]. State law may be utilized so far as it is of aid in the development of correct principles or their application in a particular case, *id.,* at 457, [77 S.Ct. 912, 1 L.Ed.2d 972] but the law which ultimately results is federal. *Wiley, supra,* 376 U.S. at 548, 84 S.Ct. at 914.

## B. *Piercing the Corporate Veil*

■ It is well established that some degree of moral culpability on the part of the parent must be shown to establish liability for a contract of a subsidiary.[7] This

> for the obligations of the disappearing corporation," *Burns,* 406 U.S., at 286, 92 S.Ct. [1571], at 1581, which suggests that holding *Wiley* bound to arbitrate under its predecessor's collective-bargaining agreement may have been fairly within the reasonable expectations of the parties. Second, the disappearance of the original employing entity in the *Wiley* merger meant that unless the union were afforded some remedy against *Wiley*, it would have no means to enforce the obligations voluntarily undertaken by the merged corporation, to the extent that those obligations vested prior to the merger or to the extent that its promises were intended to survive a change of ownership.

7. The theories most frequently employed to justify piercing the corporate veil are agency, alter ego, instrumentality of the parent or stockholder, identity of interests, equitable estoppel, undercapitalization and fraud, wrong or injustice. *See* Lattin on Corporations (2d Ed. 1971) Ch. 2; Ballantine, Corporations Ch. X (Rev.Ed.1946), Henn, Law of Corporations, Ch. 7 (2d Ed.1971); Stevens on Corporations Chs. 3, 20 (2d Ed.1949); Powell, Parent and Subsidiary Corporations (1931) Ch. III; Comment, 28 Ohio State Law Journal 441 (1967); Comment, 48 Boston University Law Review 123 (1968); Gillespie, The Thin Corporation: Loss of Limited Liability Protection, 45 Notre Dame Lawyer, 363 (1969); Berle, A Theory of Enterprise Entity, 47 Columbia Law Review 343 (1947); Douglas and Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale Law Journal 193 (1929). However, as Justice Cardozo noted, it is of little help to leave the actuality of the corporate relationship enveloped in the "mists of metaphor," *Berkey v. Third Avenue Ry. Co.,* 244 N.Y. 84, 155 N.E. 58 (1926), or a jungle of semantics. Some of these doctrines are interchangeable or at least overlap. A particular fact situation may fall under several doctrines. Several theories impose liability not by piercing the corporate barrier, but

rule holds true even when the subsidiary is found to be an alter ego or instrumentality of the parent. It is particularly so in contract cases because contracts are private, consensual relationships in which each party has a clear and equal obligation to weigh the potential benefits and risks of the agreement. Unless fraud or misrepresentation is involved, there can be little justification for disregarding corporate entities which the parties obviously expected to remain intact. *See Portsmouth Cotton Oil Refinery Corporation v. Fourth National Bank*, 280 F. 879 (M.D.Ala.), *aff'd* 284 F. 718 (5th Cir. 1922).

In *Majestic Co. v. Orpheum Circuit*, 21 F.2d 720 (8th Cir. 1927), it was held that a parent corporation was not liable for rents due under a subsidiary's lease agreement absent a showing of wrong, fraud, or illegality. The Court noted:

It is fundamental that, unless plaintiff's damages are a proximate result of some wrong of the defendant or some breach of duty the defendant owed the plaintiff, then in no event can the defendant be held liable. *Id.* at 726.

This rule was adopted and applied in *Fisser v. International Bank*, 282 F.2d 231 (2nd Cir. 1960), in which the Court found the evidence insufficient to establish that a Liberian Corporation which had breached a maritime contract with the plaintiff was the alter ego of the parent corporation. Accordingly, the Court refused to compel the parent to arbitrate in conformance with the subsidiary's contract. The Court adopted the now nearly universally accepted "in-

strumentality" test of *Lowendahl v. Baltimore & Ohio Ry. Co.*, 247 App.Div. 144, 287 N.Y.S. 62, *aff'd*, 272 N.Y. 360, 6 N.E.2d 56 (1936). In finding that the subsidiary was not the parent's alter ego, the Court applied the following test:

"Restating the instrumentality rule, we may say that in any case, except express agency, estoppel, or direct tort, three elements must be proved:

"(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

"(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

"(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." [247 App.Div. 144, 287 N.Y.S. 76.]

This rationale has been continuously followed. *See, e. g., Interocean Shipping Co. v. National Shipping and Trading Co.*, 523 F.2d 527, 539 (2nd Cir. 1975); *Berger v. Columbia Broadcasting System, Inc.*, 453 F.2d 991, 995 (5th Cir. 1972); *Steven v. Roscoe Turner Aeronautical Corporation*, 324 F.2d 157, 160 (7th Cir. 1963); *Johnson v. Warnaco, Inc.*, 426 F.Supp. 44 (S.D.Miss. 1976); *Garrow v. Soo Line Ry. Co.*, 361

by requiring the parent to respond to established legal obligations as a principal. One analysis has asserted that, of the various theories used to pierce the veil in contract cases, "only that proceeding from defendant's legal fraud or wrong extends the right to disregard the corporate entity and impose liability on a *defendant in its capacity as a shareholder or affiliate.*" Comment, Ohio State Law Journal, *supra*, at 443. The justification for piercing the veil in cases of fraud or legal wrong is that the corporate fiction of limited liability is outweighed as a public policy by the possibility of a court's acquiescing in a legal wrong or injustice. A review of cases premised on other theories only illustrates this point. *See King-*

*ston Dry Dock Co. v. Lake Champlain Transportation Co.*, 31 F.2d 265, 267 (2nd Cir. 1929), in which Judge Learned Hand discussed an "agency" theory for piercing the corporate veil; *G.E.J. Corp. v. Uranium Aire, Inc.*, 311 F.2d 749 (9th Cir. 1962), in which the Court ruled that a parent's promise to stand behind a subsidiary's contract induced the plaintiff to enter the contract and held the parent liable on an estoppel theory; *Weisser v. Mursam Shoes*, 127 F.2d 344 (2nd Cir. 1942). Occasionally, inadequate capitalization has been held to pierce the corporate veil without other reason. *Arnold v. Phillips*, 117 F.2d 497 (5th Cir.), *cert. denied*, 313 U.S. 583, 61 S.Ct. 1102, 85 L.Ed. 1539 (1941).

F.Supp. 764 (E.D.Wis.1973); *Worldwide Carriers, Ltd. v. Aris Steamship Co.*, 301 F.Supp. 64, 67 (S.D.N.Y.1968); *Hellenic Lines Ltd. v. Winkler*, 249 F.Supp. 771, 776 (S.D.N.Y.1966).

In *Interocean Shipping Co., supra*, 523 F.2d at 539, the Court applied the *Lowendahl* and *Fisser* theory to an arbitration setting, albeit a nonlabor one so that the public policy favoring arbitration was not so strong.

> True, the mere fact that a party did not sign an arbitration agreement does not mean that it cannot be held bound by it. Ordinary contract principles determine who is bound. In an appropriate situation, the corporate veil may be pierced and a party may be held bound to arbitrate as the signatory's alter ego. *Fisser v. International Bank*, 282 F.2d 231, 233–34 (2 Cir. 1960).

Maine's case law contains only a handful of instances dealing with efforts to disregard corporate entities, none of them in a successor corporation framework.

Two recent cases involve attempts by corporations to convince the State Tax Assessor to disregard corporate formalities so that transactions between a parent and a subsidiary might escape Maine's use tax. The Maine Supreme Judicial Court refused in each case to pierce the corporate veil. *Maine Aviation Corp. v. Johnson*, 160 Me. 1, 6, 196 A.2d 748 (1964), and *Bonnar-Vawter, Inc. v. Johnson*, 157 Me. 380, 387, 173 A.2d 141, 145 (1961), in which the Court said:

> The corporate entity will be disregarded when used to cover fraud or illegality, or to justify a wrong. It will not be disregarded when to do so would promote an injustice, give an unfair advantage or contravene public policy.

Another strain of Maine cases involves the allowance of recovery of judgment for the debts of insolvent corporations or municipalities from shareholders of the corporation or residents of the municipalities. However, each of these cases relied upon a statute granting such a derivative right of recovery. The relevant statutes were repealed before the start of the century. *E.*

*g., Coffin v. Rich*, 45 Me. 507 (1858); *Milliken v. Whitehouse*, 49 Me. 527 (1860); *Came v. Brigham*, 39 Me. 35 (1856); *Eames v. Savage*, 77 Me. 212 (1885).

A more recent exposition of Maine law on this point is found in *Maine Unemployment Compensation Commission v. Androscoggin Junior, Inc.*, 137 Me. 154, 16 A.2d 252 (1940). In *Androscoggin*, the Court upheld a statute defining as an employer "[a]ny employing unit which together with one or more other employing units is owned or controlled (by legally, enforceable means or otherwise) directly or indirectly by the same interests . . . ." The Court noted:

> While it is true that a corporation is a separate entity from its stockholders, yet it is apparent that the legislature, when it enacted this statute, intended to go behind the corporate veil and discover actuality and if it were found that the company, although a corporation, were one so controlled, compel contribution. Otherwise, an individual intending to carry on a business of considerable magnitude, requiring the employment of many more than eight, could organize several corporations, and employing less than eight, escape contribution, and deprive many employees of the benefits intended by the Act. *Androscoggin, supra*, at 161, 16 A.2d at 256.

Recovery was allowed against the owners of two-thirds of the stock of the corporation, on the grounds that they totally controlled it. Control, rather than mere ownership was the determining factor.

The strong, equitable nature of the piercing doctrine is demonstrated in a case relied on by the *Androscoggin* Court, *Chicago-Milwaukee R. R. Co. v. Minneapolis Civil and Commercial Ass'n*, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229 (1918). *Chicago-Milwaukee* is good law today. It was cited most recently in *United States v. Sexton Cove Estates*, 526 F.2d 1293 (5th Cir. 1976), in support of the need to allege and prove facts at trial to warrant piercing the corporate veil, absent statutory establishment of personal liability of officers or directors for corporate behavior.

*Chicago-Milwaukee* was cited again in a case which arose in Maine's Federal District Court, *Bangor Punta Operations, Inc. v. Bangor and Aroostook Railroad Co., Inc.,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1973), involving both Maine and federal law relating to efforts to pierce the corporate veil. Although the facts are not on point, the general statement with regard to piercing the corporate veil is. The Court said:

> We are met with the argument, however, that since the present action is brought in the name of respondent corporations, we may not look behind the corporate entity to the true substance of the claims and the actual beneficiaries. The established law is to the contrary. Although a corporation and its shareholders are deemed separate entities for most purposes, the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy. *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 442, [54 S.Ct. 788, 791, 78 L.Ed. 1348] (1934); *Chicago, M. & St. P. R. Co. v. Minneapolis Civic Assn.,* 247 U.S. 490, 501, [38 S.Ct. 553, 557, 62 L.Ed. 1229] (1918). In such cases, courts of equity, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form. Thus, where equity would preclude the shareholders from maintaining an action in their own right, the corporation would also be precluded. *Amen v. Black, supra* [234 F.2d 12 (10 Cir. 1956)]; *Capitol Wine & Spirit Corp. v. Pokrass,* 277 App.Div. 184, 98 N.Y.S.2d 291 (1950), *aff'd,* 302 N.Y. 734, 98 N.E.2d 704 (1951); *Matthews v. Headley Chocolate Co., supra,* [130 Md. 523, 100 A. 645 (1917)]; *Home Fire Insurance Co. v. Barber, supra* [67 Neb. 644, 93 N.W. 1024 (1903)]. It follows that Amoskeag, the principal beneficiary of any recovery and itself estopped from complaining of petitioners' alleged wrongs, cannot avoid the command of equity through the guise of proceeding in the name of respondent corporations which it owns and controls. *Bangor Punta, supra,* at 713, 94 S.Ct. at 2584.

In addition, the Court noted that *Bangor* and *Aroostook* fared no better under state law, since "the principle that the corporate entity may be disregarded if equity so demands is supported by Maine precedents," citing *Bonnar-Vawter, Inc. v. Johnson, supra,* 157 Me. at 387–388, 173 A.2d 141.

*Bangor Punta,* then, is the most important statement of the law regarding disregard of the corporate entity for both federal and Maine law. The federal law involved the Clayton Act, 15 U.S.C. § 520, and the Securities and Exchange Act of 1934, 15 U.S.C. 78j(b). The state law involved was the Public Utilities Act, 35 M.R.S.A.S. 104, and Maine common law.

■ The cases on piercing the corporate veil have two distinct origins: first, controversies involving only state law, second, those involving a conflict between state corporation law and federal statutes. Federal policies are not to be defeated by deference to state limitations on corporate liability and reliance on the impenetrability of the corporate veil. In *Anderson v. Abbott,* 321 U.S. 349, 365, 64 S.Ct. 531, 539, 88 L.Ed. 793 (1944), the Court said:

> It is of course true that Delaware created this corporation. But the question of liability for these assessments is a federal question. The policy underlying a federal statute may not be defeated by such an assertion of state power. *Northern Securities Co. v. United States,* 193 U.S. 197, 349, [24 S.Ct. 436, 461, 48 L.Ed. 679]; *Seabury v. Green, supra* [294 U.S. 165, 55 S.Ct. 373, 79 L.Ed. 834]. The spectre of unlimited liability for stockholders has been raised. But there is no cause for alarm. Barring conflicting federal incorporation statutes, Delaware may choose such rules of limitation on the liability of stockholders of her corporations as she desires. And those laws are enforceable in federal courts under the rule of *Erie R. Co. v. Tompkins,* 304 U.S. 64, [58 S.Ct. 817, 82 L.Ed. 1188]. But no State may endow its corporate creatures with the power to place themselves above the Congress of the United States and defeat the federal policy concerning na-

tional banks which Congress has announced.

I conclude from this analysis that a federal court may pierce the corporate veil for any reason acceptable under the common law of the state in question or if disregarding the corporate entities is the only way to protect a substantial federal policy or interest.[8]

My analysis, then, boils down to three questions:

1. Was Kennebec sufficiently integrated with Penntech to satisfy the traditional test for determining when corporate entities must be disregarded;

2. Was the corporate form used as a cover for fraud or misrepresentations on which the plaintiffs relied to their detriment; and

3. Was the corporate form used to defeat a major federal policy, in this instance arbitration of collective bargaining agreements?

It must be kept in mind that this is a contract action and that the parties relied on the corporate entities as they existed at the signing of the contract.

There can be no question but that Penntech, as sole stockholder of Kennebec, controlled it completely. The collective bargaining agreement was changed at Penntech's request. Penntech participated in the negotiations to write down Kennebec's debt. Penntech's attorneys were used by both corporations. The management of all three companies, Penntech, TP, and Kennebec, were so intertwined that the officers and directors of each would scarcely know when they were acting for one corporation or the other.

There is no evidence or allegation that Penntech represented to the Unions that it would be responsible for meeting the terms of the arbitration agreement. There is no evidence or allegation that Kennebec's income or assets were diverted to Penntech. There is no evidence or allegation that Penntech caused the demise of Kennebec's operations either deliberately or through mismanagement. There is no allegation or evidence that any fraud or misrepresentations by Kennebec or Penntech induced the plaintiffs to enter into the collective bargaining agreement. Indeed, the evidence on this is to the contrary. Kennebec's operations were already shut down when Penntech bought its stock. It can be fairly inferred that all parties, including the plaintiffs, hoped that Penntech's guidance and management would result in a successful operation of the mill. Had this occurred, then the provisions of the labor contract would have been fully enforceable against a profitable Kennebec.

I find that, although there was sufficient integration between Kennebec and Penntech to challenge the relationship between the two corporations, such challenge must fail because there was no fraud or misrepresentation by either Kennebec or Penntech as to the scope and application of the collective bargaining agreement.

The motions to compel Penntech and TP to arbitrate are denied.

SO ORDERED.

---

8. An exception to this generalization may arise when the corporate form is dictated by federal law. *Anderson v. Abbott, supra,* 321 U.S. at 365, 64 S.Ct. 531.